1   **DREHER LAW FIRM**
2   Robert Scott Dreher (SBN 120527)
    Robert Scott Norman (SBN 253185)
3   Carlos Americano (SBN 257070)
    Historic Louis Bank of Commerce Building
4   835 Fifth Avenue, Suite 202
5   San Diego, California 92101
    Telephone: (619) 230-8828
6   Facsimile: (619) 687-0136
    E-mail: scott@dreherlawfirm.com
7

8   **ACLU FOUNDATION OF SAN DIEGO
    & IMPERIAL COUNTIES**
9   David Blair-Loy (SBN 229235)
    P.O. Box 87131
10  San Diego, California 92138-7131
11  Telephone: (619) 232-2121
    Facsimile: (619) 232-0036
12  E-Mail: dblairloy@aclusandiego.org

13  Attorneys for Plaintiffs

14

15              **UNITED STATES DISTRICT COURT**

16             **SOUTHERN DISTRICT OF CALIFORNIA**

17

18

19  THE ISAIAH PROJECT, INC.; JOHN A.    | Case No.
    CRAWFORD;   ROBERT   BARAJAS;        |
20  MARVIN COOPER; YOLANDA DIAZ;         | **COMPLAINT FOR DECLARATORY AND
    IRENE MARTINEZ-CRUZ; STEPHEN         | INJUNCTIVE   RELIEF   AND   FOR
21  JOHNSON; DARRICK JONES; SYLVIA       | DAMAGES**
    LIEVANOS;   EMMANUEL   GARCIA;       |
22  INDIVIDUALLY  &  ON  BEHALF  OF      |
    THEMSELVES   AND   ALL   OTHERS      | *CLASS ACTION*
23  SIMILARLY SITUATED,                  |
                                         | *DEMAND FOR JURY TRIAL*
24
                 Plaintiffs,             |
25                                       | Dept.:
                                         | Date:
26         v.                            | Time:
27  (*caption continued on next page …*)
28

FILED

09 DEC -2 PM 3: 16

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                     DEPUTY

'09 CV 2699 BTM WVG

---

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES

1   CITY OF SAN DIEGO; CITY OF SAN
2   DIEGO POLICE DEPARTMENT; CITY OF
    SAN DIEGO POLICE CHIEF WILLIAM
3   LANSDOWNE; CITY OF SAN DIEGO
    ENVIRONMENTAL SERVICES DEPART-
4   MENT; CITY OF SAN DIEGO
    ENVIRONMENTAL SERVICES DIR-
5   ECTOR CHRIS GONAVER; DOWN-
6   TOWN SAN DIEGO PARTNERSHIP,
    INC.; and DOES 1-50, inclusive,
7

8         Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

1.      The City has mounted a campaign against its homeless citizens with a series of well-planned, ruthlessly executed and mean-spirited raids designed to harass these citizens and "drive them away." Preferably to Arizona. Around lunchtime, while these homeless people are seeking services inside a church and a nearby homeless shelter, a veritable platoon of City workers and garbage trucks, escorted by a fleet of police cars and a phalanx of armed police officers, descends upon the area, forms a barricade around Plaintiffs' possessions, and throws all these possessions into the garbage trucks. In so doing, the City takes items critical to Plaintiffs' survival including identification, clothing, medication, bedding, food, and money, as well as irreplaceable personal belongings such as family photographs and heirlooms.

2.      The City knows that these items are not trash and that they have been placed outside the church or the shelter only temporarily, while their owners are inside seeking necessities such as food and use of a bathroom. The City also knows these things belong to homeless people and constitute the entirety of their possessions. The raids themselves are contrary to the Police Department's own rules and procedures.

3.      Sure enough, within moments of the arrival of the City's Police-and-trash brigade, Plaintiffs hustle out of the shelter and beg the Police officers to be allowed to retrieve some of their property, such as money, wallets, prescription medication, irreplaceable family pictures, and clothing. The Police officers ignore the pleas, refuse to surrender the items to the rightful owners, and make sure that their guns, handcuffs and cans of mace spray are visible. "It's too late," they say. "This is City property now. But I hear the weather in Phoenix is nice this time of year...!"

---

4.     The pretext is that these things are "trash," "rubbish," "waste."  But the raids have nothing to do with cleaning up "trash."  Instead, the purpose of these raids is something very different -- the City considers its homeless citizens to be the "rubbish" that needs to be removed.

5.     Defendants seize and destroy Plaintiffs' property without a warrant, probable cause, or exigent circumstances, and without providing adequate notice or any opportunity for Plaintiffs to be heard.  The actions are unlawful.  Plaintiffs ask that the Court put a stop to them immediately, and award reparations designed to (a) ensure that the City will not do it again and (b) compensate Plaintiffs and the Class members appropriately.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343, and Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.     The Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

8.     The Court has authority to grant injunctive relief in this action pursuant to Rule 65 of the Federal Rules of Civil Procedure.

9.     Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. § 1391(b).  Defendants are located in this District and all the acts and/or omissions complained of herein have occurred or will occur here.

## IDENTIFICATION OF PARTIES

10.    Plaintiff THE ISAIAH PROJECT, INC. is a 501(c)(3) nonprofit corporation organized and existing under the laws of the State of California and doing business in San Diego, California.   The organization's name and its Christian mission come from the

Biblical mandate to care for the poor, as set forth in the Book of Isaiah, where God asked, "Is not this the fast that I choose...to share your bread with the hungry, and bring the homeless poor into your house; [and] when you see the naked, to cover them?" (Isaiah 58:6-7).  For most, a shopping cart is just that, something used to carry groceries and other merchandise.  But for the homeless, a shopping cart is where they must keep their most important personal belongings, such as clothes, medication, tents and blankets, as well as irreplaceable personal possessions, such as family photographs, identification, personal records and documents.  So to help Plaintiffs avoid the use of "stolen" grocery-store shopping carts, THE ISAIAH PROJECT purchased its own shopping carts and lent them to homeless people to haul their belongings.  Each of these "Born Again Baskets" is affixed with a sign that reads: "This basket was purchased by The Isaiah Project, Inc., and may be used by anyone on the streets of the City of San Diego who has need for it." Defendants confiscated and destroyed at least 9 "Born Again Baskets" in the September 22, 2009 and October 7, 2009 raids described herein.

11.     Plaintiff JOHN A. CRAWFORD is a resident of the City of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular and adequate nighttime residence.  The City confiscated and destroyed his personal property, including his study Bible, walking cane, 3 blankets, 2 comforters, radio, small ice chest, food, backpacks, all his clothes and shoes, personal hygiene supplies, and the shopping cart he was using with permission of THE ISAIAH PROJECT in the raids described herein -- September 22; October 7; and October 15, 2009.  He was given no opportunity to retrieve his property, and no notice that it might be seized in this fashion.

12.   Plaintiff ROBERT BARAJAS is a resident of the City of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular and adequate nighttime residence.   He was refused access to his property and forced to stand by and watch as all of his possessions were seized and destroyed in the City's September 22, 2009 raid, including his prescription medication, identification, all his clothes and shoes, blankets, and family photos, which contained the only pictures he had left of his children and the last remaining picture of his deceased mother.  He was left with the clothes he was wearing and a tube of Chapstick.  He was given no opportunity to save or retrieve any of his property, and no notice that it might be seized in this fashion.

13. Plaintiff MARVIN COOPER is a resident of the City of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular and adequate nighttime residence. He was refused access to his property and forced to stand by and watch as all of his possessions were seized and destroyed in the City's September 22, 2009 raid, including his winter coat, clothes, bedding, personal documents, and other property. He given no opportunity to save or retrieve any of his property, and no notice that it might be seized in this fashion.

14.   Plaintiff YOLANDA S. DIAZ is a resident of the City of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular and adequate nighttime residence.  The City confiscated and destroyed her personal property, including her disabled medical identification card, prescription

medication, her clothes, shoes, sleeping bag, blankets, folding chairs, tent, backpack, family photographs, personal hygiene supplies, and the shopping cart she was borrowing from THE ISAIAH PROJECT, INC., in the September 22, 2009, and October 7, 2009 raids described herein. She was given no opportunity to save or retrieve any of her property, and no notice that it might be seized in this fashion.

15.     Plaintiff IRENE MARTINEZ-CRUZ is a resident of the City of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a fixed, regular and adequate nighttime residence. The City confiscated and destroyed her personal property, including her study Bible, clothes, shoes, sleeping bag, bedding, family photographs, personal hygiene supplies, and the shopping cart she was borrowing from THE ISAIAH PROJECT, INC., in the September 22, 2009, and October 7, 2009 raids described herein. She was given no opportunity to save or retrieve any of her property, and no notice that it might be seized in this fashion.

16.     Plaintiff STEPHEN JOHNSON is a resident of the City of San Diego and at all relevant times herein was and now is homeless as the term is defined in the Stewart B. McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a fixed, regular and adequate nighttime residence. The City confiscated and destroyed his few personal belongings on September 22, 2009, including his study Bible, pillows and blankets, all his clothes and shoes, personal hygiene supplies, backpack, $80 cash, pictures of his family, and other personal property. He was given no opportunity to save or retrieve any of his property, and no notice that it might be seized in this fashion.

17.     Plaintiff DARRICK JONES  is a resident of the City of San Diego and at all

relevant times herein was and now is homeless as the term is defined in the Stewart B.

McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a

fixed, regular and adequate nighttime residence.  The City confiscated and destroyed his

personal property on September 22, 2009, including his tent, all his clothes and shoes,

MP3 player, laptop computer, blankets, sleeping bags, photographs of his children and

mom, and other personal property.  He was given no opportunity to save or retrieve his

property, and no notice that it might be seized in this fashion.

        18.     Plaintiff SYLVIA LIEVANOS is a resident of the City of San Diego and at all

relevant times herein was and now is homeless as the term is defined in the Stewart B.

McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as she lacks a

fixed, regular and adequate nighttime residence. The City confiscated and destroyed her

personal property on September 22, 2009, including psychological medication, blankets,

sleeping bag, her clothes and shoes, and other personal property.  She was given no

opportunity to retrieve her property, and no notice that it might be seized in this fashion.

        19.     Plaintiff EMMANUEL GARCIA is a resident of the City of San Diego and at all

relevant times herein was and now is homeless as the term is defined in the Stewart B.

McKinney Homeless Assistance Act, 42 U.S.C § 11301 et seq., inasmuch as he lacks a

fixed, regular and adequate nighttime residence.  The City confiscated and destroyed his

personal property on October 7, 2009, including luggage, clothes, 4 blankets, and the

shopping cart he was borrowing from ISAIAH PROJECT.  He was given no opportunity to

retrieve any of his property, and no notice that it might be seized in this fashion.

        20.     Defendant CITY OF SAN DIEGO is now, and at all times mentioned in this

complaint was, a municipal corporation organized, acting and existing under the laws of

California.   The CITY OF SAN DIEGO, through its agents and/or policymakers the Environmental Services Department, Environmental Services Director, Police Department, and/or Police Chief has adopted, implemented, and enforced customs, policies, practices, and customs which discriminate against homeless individuals and result in violations of their rights under the Constitution of the United States, the California Constitution, and California law, as described herein.

21.   Defendant CITY OF SAN DIEGO POLICE DEPARTMENT is the CITY OF SAN DIEGO's law enforcement department, and Individual Defendant WILLIAM LANSDOWNE is the City's Chief of Police, and in that capacity is responsible for the operation of the Police Department.   The City Charter mandates that the Chief of Police shall appoint, direct and supervise the personnel of the department and exercise all powers and duties provided by general laws or by ordinance of the City Council.   These laws and ordinances include, but are not limited to, San Diego Municipal Code § 22.0601, which charges the CITY OF SAN DIEGO POLICE DEPARTMENT "with the preservation of the peace and order of the City, <u>the protection of all persons and property</u>, and the enforcement of all penal ordinances and laws."   All unattended and unclaimed property "shall be held in the possession of the Police Department of The City of San Diego for a period of at least three (3) months, and may be sold thereafter at a public auction to the highest bidder, under and pursuant to Section 2080.4 of the Civil Code of the State of California." SDMC § 22.0603; *see also* SDMC § 54.0212.

22.   Defendant ENVIRONMENTAL SERVICES DEPARTMENT is the CITY OF SAN DIEGO's waste management department, and Individual Defendant CHRIS GONAVER is the Department Director, and in that capacity is responsible for the operation

of the ENVIRONMENTAL SERVICES DEPARTMENT. The ENVIRONMENTAL SERVICES DEPARTMENT's mission is to "protect the environment and to provide all San Diego residents with properly disposed municipal solid waste, along with an environment free of litter and illegal dumping." SDMC §54.0212 mandates that "[w]herever possible, Enforcement Officials shall make a reasonable effort to ascertain whether the unattended personal property or possessions have been abandoned," and "unattended personal property or possessions that are sanitary and saleable or useable and of a value greater than one hundred dollars ($100) shall be transferred as soon as is practicable to the Chief of Police."

23.     Defendant DOWNTOWN SAN DIEGO PARTNERSHIP, INC. ("DSDP") is now, and at all times relevant times herein was, a nonprofit 501(c)(6) corporation organized, acting and existing under the laws of California. Formed in 1993 by the merger of two Downtown San Diego business organizations -- San Diego Downtown Association/Central City Association and San Diegans, Inc. -- its membership consists of more than 325 local businesses. One of the "primary goals" of DSDP is to "enhance and complement" the SAN DIEGO POLICE DEPARTMENT by acting "as an extra set of 'eyes and ears' for law enforcement." It also manages the Downtown "Clean & Safe Program," which oversees "enhanced maintenance and safety services" in the Downtown and East Village neighborhoods. The Partnership receives funds from property tax assessments within the Downtown and East Village neighborhoods to administer the program. According to its website (www.sdcleanandsafe.org), the Clean & Safe Team "removes an average of nearly 2 tons of garbage per day from the public right of way." Some of this "garbage" is the valuable personal property of Plaintiffs, which DSDP, acting through its

agents and/or employees, confiscated and summarily destroyed at the direction of, acting in concert with, and/or under contract with the CITY OF SAN DIEGO, as described herein.

24.     All of the above Individual Defendants are sued in their individual capacities for the unlawful conduct alleged herein.  The Individual Defendants acted as policymakers for the CITY OF SAN DIEGO with respect to all acts alleged herein.

25.     Plaintiffs are informed and believe that DOES 1 through 50 at all relevant times herein were officers and employees of the Defendants, including the SAN DIEGO POLICE DEPARTMENT, the SAN DIEGO ENVIRONMENTAL SERVICES DEPARTMENT, and the DSDP, who aided, abetted, assisted, or otherwise helped plan or carry out these raids.   Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 50 and therefore sue said Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. .Plaintiffs are informed and believe that each of these actors is liable for, and proximately caused, the injuries and violations of constitutional and statutory rights complained of herein.

26.     Plaintiffs are informed and believe that the acts of Defendants complained of herein were undertaken under color of law and in the execution of customs, policies and practices of authorized policymakers of Defendant CITY OF SAN DIEGO, including but not necessarily limited to the Individual Defendants, and were joined in or implemented by the remaining Defendants, and each of them, acting as the agent, servant, employee or in concert, or in conspiracy with each of the other Defendants.  Each Defendant caused, and is liable for, the unconstitutional and unlawful conduct and resulting injuries by, among other things, personally participating in said conduct or acting jointly or conspiring with

others who did so; by directing, encouraging, authorizing, acquiescing or setting in motion policies, plans and actions that led to the unlawful conduct; by knowingly failing to take action to prevent the unlawful conduct; by failing and refusing with deliberate indifference to maintain adequate training and supervision; by promulgating customs, practices, and/or policies that repudiated constitutional rights and were the moving force of the constitutional violations; and by ratifying the unlawful conduct taken by employees under their direction and control, including failing to take remedial or disciplinary action.

27.     The acts complained of herein were intentionally and jointly committed, and they will continue systematically unless Defendants are restrained by this Court.

## CLASS ALLEGATIONS

28.     The claims set forth herein are brought by Plaintiffs on their own behalf and as representatives of a Class of similarly situated persons pursuant to Rules 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

29.     Plaintiffs seek to represent a class consisting of owners of personal property lawfully possessed by homeless persons in the City of San Diego that has been or will be taken and/or destroyed by one or more of the Defendants as a result of the customs, policies, actions and/or practices described herein.

30.     The members of the Class are so numerous that individual joinder of all members is impracticable. Plaintiffs are informed and believe and on that basis allege that the members of the Class well exceed 100 in number.

31.     There are questions of law and/or fact common to the class, including but not necessarily limited to the following:

a.     Whether Defendants' customs, policies, practices and conduct of

taking and destroying the personal property of homeless people, in the absence of a warrant and without providing either adequate notice or the opportunity to retrieve personal possessions before they are destroyed, and without a legitimate governmental interest, violated and continues to violate the Class members' federal and/or constitutional rights against unreasonable search and seizure;

b.      Whether Defendants' customs, policies, practices and conduct of taking and destroying the personal property of homeless people, without providing either adequate notice, opportunity to be heard, or the opportunity to retrieve personal possessions before they are destroyed, violated and continues to violate the Class members' due process rights under the United States Constitution and/or the California Constitution;

c.      Whether Defendants' taking and destroying the personal property of homeless people derived from animus toward homeless persons and/or lacked any rational relationship to a legitimate governmental interest and thus violated and continues to violate the class members' equal protection rights under the United States Constitution and/or California Constitution;

d.      Whether Defendants' taking and destroying the personal property of homeless people violated California statutory and common law; and

e.      Whether injunctive relief restraining further unconstitutional and unlawful acts by Defendants should be ordered by the Court and, if so, the nature of that injunctive relief.

32.      Plaintiffs' claims are typical of the claims of the Class as a whole.  Plaintiffs' claims arise from the same policies, customs, and/or practices that give rise to the claims

of the Class, and Plaintiffs' claims are based on the same legal principles as those of the Class members. Plaintiffs have all suffered from Defendants' unlawful seizure and destruction of their personal property without a warrant or adequate notice, opportunity to be heard, or opportunity to retrieve personal belongings before destruction. Plaintiffs have been directly injured by Defendants' unlawful actions and are at significant risk of suffering similar injury in the future.

33. Plaintiffs will fairly and adequately protect the interests of the Class. They have retained counsel who are experienced and competent in class action and civil rights litigation. Plaintiffs have no interests that are adverse or antagonistic to interests of other members of the Class.

34. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

35. The questions of law or fact common to Class members predominate over any questions affecting only individual Class members. A class action is superior to any other method in order to secure a fair and efficient adjudication of this controversy. As the primary relief sought is injunctive in nature, the burden and expense make it impractical for Class members to seek redress individually for the wrongs done to them. The nature and amount of monetary damages sustained by each Class member is very similar in nature and may be established by common proof. Individual litigation by each Class member would necessarily and substantially burden the operation of the judicial system.

//

//

## FACTS

36.    On January 31, 2008, a count of homeless people was conducted by the San Diego Regional Task Force on Homelessness. (2008 Regional Homelessness Profile at 2, attached hereto as Exhibit 1). A total number of 7,582 homeless people were counted in the San Diego county region. (*Id.*) Of this total, 3,856 were unsheltered and sleeping in the streets, an additional 1,009 were housed in emergency or seasonal shelters and 2,717 lived in transitional facilities. (*Id.*) More than half (53.8%) of the region's homeless individuals lived in the City of San Diego. (*Id.* at 14.)

37.    Emergency and transitional facilities do not provide sufficient space to meet the needs even for temporary overnight accommodations.  Because of this, the City is bound by an Order of this Court prohibiting it from issuing "sleeping tickets" pursuant to Penal Code 647(j) (Spencer v. City of San Diego, (2007), U.S.D.C., Southern District of California, Case No. 04cv2314, Hon. Wm. McCurine, Exh. 2).  On any given night, there are at least as many homeless people on the streets as there are in shelters.[1]  And even for those fortunate enough find a shelter at night, the shelters typically require them to leave during the day.  Consequently, homeless people in the City of San Diego often have no place other than public parks or sidewalks in which to eat, sit, or rest, or to place their personal possessions while they do so.

38.    Following the construction of Petco Park and the attendant designation of its immediate and neighboring area (commonly known as "East Village") as "redevelopment zones," the Defendants devised, promulgated, directed, and/or encouraged an ongoing

---

[1] When compared to the nation as a whole, fewer San Diego homeless were housed in emergency shelters or transitional facilities (49%) than in the rest of the U.S. (58%).  2008 Regional Homelessness Profile at 13, attached hereto as Exhibit 1.

and continuing custom, policy, and/or practice of unlawfully confiscating and destroying the personal possessions of the homeless living in the City of San Diego, without warrants or adequate notice, opportunity to be heard, or opportunity to retrieve personal possessions. They do this by directing, encouraging, knowingly acquiescing in, or ratifying deliberate and coordinated "raids" in which City waste-collection employees, DSDP employees, and/or Police Officers swarm *en masse* into an area where homeless people are known to congregate, and in a great show of force confiscate and destroy all of the homeless people's possessions. No legitimate, lawful or moral basis exists for this wholesale confiscation and destruction of people's property, which according to Jose Ysea, spokesperson for the Environmental Services Department, has occurred at least 27 times during "abatements" conducted since July 1, 2008. (See Kelly Davis, "One person's trash," San Diego City Beat (September 29, 2009) available online at http://www.sdcitybeat.com/cms/story/detail/one_person_s_trash/8529/, attached as Exh. 3.) As Mr. Ysea stated, the Environmental Services Department conducted "a joint operation with the San Diego Police Department that stemmed from a citizen complaint about homeless people ..." *Id.*

39. The City provides no means for the homeless to claim or retrieve their personal property once it is seized, primarily because all of it is immediately and summarily destroyed. The law requiring such opportunity is ignored by Defendants. Any attempt to question the process or retrieve possessions is met with threat of arrest, citation, or worse. The City deters any attempt to question or interfere with the seizure and destruction of the possessions of the homeless, before, during AND after its seizure and destruction.

40.     On the morning of September 22, 2009, a group of homeless people, including some of the Plaintiffs, temporarily placed their things -- shopping carts, clothing, prescription medication, sleeping bags, blankets, pictures of children and parents -- on the sidewalk along a fenced, vacant lot on the corner of 16th Street and Island Avenue. Some of these people then walked around the corner to the Neil Good Day Center, while others went inside God's Extended Hand, a small East Village church across the street that shares food, care and ministry with the hungry, homeless and poor, on a daily basis.

41.     Within minutes, apparently in response to some pre-arranged signal, members of the Defendants' Police and Environmental Services departments, and a City garbage truck, descended like a tidal wave upon the sidewalk. At the direction of and pursuant to the custom, policy, and/or practice of the City of San Diego, they took the shopping carts and personal property and tossed it all into the garbage truck and crushed it, even though they knew that what they were destroying was somebody's property and was not waste, rubbish or trash.

42.     Word spread fast, and a few minutes after the destruction began, people, including some of the Plaintiffs, ran out of the church and begged the Police officers to stop. "Please let us retrieve our things," they pleaded, "That's everything we have!" "Too late." said the Police. "This is City property now. Don't touch anything."

43.     Plaintiffs' continued attempts to save their things were met with threats of citation and arrest; some people were physically restrained or ordered by Police officers to stand and watch as their things were thrown into the garbage truck. For example, Plaintiff JOHN CRAWFORD was arrested and held by a Police officer prone against a police car

for saying "But that's my stuff."   CRAWFORD watched as the officer studied a sign attached to his shopping cart.  It read:

# GOD
**HASN'T GIVEN**
# UP ON
# US

44.    "Now, don't that just break your heart," the Police Officer mocked, before nodding his head and directing a City worker to toss the cart into the garbage truck. CRAWFORD, felt sick as he watched everything he owned thrown away.

45.    "What am I supposed to do now?" CRAWFORD asked the officer.  "You can head for the Arizona border," the officer replied. "I hear Phoenix is nice this time of year."

46.    Acting in conformity with Defendants' directions and/or encouragement, and pursuant to City of San Diego custom, policy, and/or practice, the City employees participating in the raid made no effort to determine the ownership of the carts or their contents.   They made no attempt to determine whether they had seized trash or someone's personal belongings.   The shopping carts and their contents weren't abandoned and no legal basis existed to destroy them.   In fact, at least nine of the shopping carts destroyed were "Born Again Baskets," purchased and lent to these people by Plaintiff THE ISAIAH PROJECT. The City employees immediately threw these and other carts -- which are essential to the homeless' ability to store their property and move it

from one place to another -- into a trash compactor.

47.    When the City's raid was complete, nothing was left except confusion and anger -- and the very garbage which the City SHOULD have been collecting:



48.    Plaintiffs did not have adequate notice that the City would seize or destroy their property.  Defendants' post-raid assertion, that sometime the week before the raid the City's Waste Reduction & Disposal Division of the Environmental Services Department had posted paper "notices" warning of its actions in a few places in the East Village area of San Diego,  (Exh. 4) is disingenuous.  These "notices" stated only that "*City-owned property will be abated of all waste (rubbish, recyclable waste material, etc.) on or after: 9-18-09,*" and "*All personal items of value must be removed prior to the above date or they will be removed by City forces.*"  First, the City left the "rubbish, waste material, etc." lying on the ground.  Second, Plaintiffs' property was not "waste, rubbish, or recyclable waste material,"

nor was it placed there on September 18, 2009.  Third, these "notices" were not placed in the location where Defendants conducted the aforementioned raids.  Fourth, the posting of paper "notices" on a fence or telephone pole does not relieve Defendants of their constitutional obligations not to unlawfully seize and destroy people's personal property.  These "notices" were inadequate to provide meaningful or effective notice to those who would be affected by the City's conduct, both because of the manner in which the notice was given and because the City knew or should have known that Plaintiffs' property was not trash and that Plaintiffs would not receive the notice or understand that their personal property was going to be removed _and_ destroyed despite their timely attempts to claim it.

49.   On October 7, 2009, at the direction or encouragement of Defendants and acting pursuant to City of San Diego custom, policy, and/or practice City Police Officers and employees of the Downtown San Diego Partnership returned to the area in another show of "shock and awe," without notice (after waiting until Plaintiffs entered the Church or the Neil Good Center) with another Garbage Truck (this one owned by the DSDP) and again seized and destroyed property that Plaintiffs and other homeless people had temporarily placed on the sidewalk.  This time, however, the Defendants left the shopping carts sitting empty on the sidewalk – a stunning admission that they knew the carts and their contents were not, after all, trash.  The DSDP employees acted at the direction of DSDP, which was acting in concert with, at the direction of, and/or under contract with the City of San Diego and/or the Individual Defendants.

50.   A week later, on the morning of October 15, 2009, at the direction or encouragement of Defendants and acting pursuant to City of San Diego custom, policy, and/or practice, City employees again seized and destroyed personal property that

Plaintiffs and other homeless individuals had temporarily placed on the sidewalk.  Again, the City gave no notice that it would seize and destroy Plaintiffs' property.  Again, the Defendants made no provision of any kind for the homeless people to claim or retrieve their property.  Ironically, along with the empty shopping carts, this time the Defendants left behind a homeless man's broom and dustpan.

51.     None of Plaintiffs' property was abandoned, and none of it presented any imminent danger to public health or safety.  Plaintiffs' property was relatively clean and packed tightly into carts and did not obstruct the sidewalk or right of way.  Nonetheless, in all of the foregoing instances, individuals acting at the direction or encouragement of Defendants and pursuant to City of San Diego custom, policy, and/or practice seized and destroyed Plaintiffs' personal property without a warrant, probable cause, exigent circumstances, or adequate notice, without taking an inventory of it, and without any opportunity to be heard or opportunity to retrieve it.

## REQUISITES FOR RELIEF

52.     Defendants' policies, actions and conduct have resulted and will result in irreparable injury to Plaintiffs. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Defendants have made it plain by their actions and the ongoing nature of their activities that they intend to continue the unlawful conduct described above.  Defendant City of San Diego has apparently adopted and enacted a custom, policy, and/or practice of confiscating and destroying the personal property of Plaintiffs and members of the Class without legal basis and the remaining Defendants have participated and will continue to participate in implementing this policy and practice unless and until restrained by an injunctive decree of this Court.

53.     The acts of Defendants as alleged above constituted violations of established constitutional rights of Plaintiffs, and Defendants could not reasonably have thought that their conduct in intentionally seizing and immediately destroying all of Plaintiffs' personal property as alleged herein was lawful or consistent with Plaintiffs' constitutional rights.

54.     An actual controversy exists between Plaintiffs and Defendants in that Defendants have engaged in the unlawful and unconstitutional conduct as alleged herein and intend to continue this unlawful conduct as an ongoing practice and policy of the City of San Diego, whereas Plaintiffs claim that these practices are unlawful and unconstitutional and therefore seek a declaration of rights with respect to this controversy.

55.     As a direct and proximate result of the unconstitutional and unlawful policies, practices and conduct of Defendants, Plaintiffs and members of the Plaintiff class have suffered, and will continue to suffer damages, including but not limited to deprivation and destruction of property, including clothing, bedding, prescription medication, personal documents and other personal possession, leaving them without their essential personal belongings necessary for shelter, health, well-being and personal dignity.

56.     The acts of Defendants were willful, wanton, malicious, and oppressive and done with conscious disregard and deliberate indifference for Plaintiffs and their rights.

57.     Plaintiffs have submitted administrative claims with the City of San Diego pursuant to California Government Code §§ 900 et seq., on behalf of themselves and all Class Members. In the event the claims are denied, Plaintiffs reserve the right to seek leave to amend this Complaint to seek damages for violations of the state law alleged herein.

//

### FIRST CLAIM FOR RELIEF
**(Denial of Constitutional Right Against Unreasonable Search and Seizure in
Violation of the Fourth and Fourteenth Amendment to the U.S. Constitution)**

58.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 57 above, as though fully set forth.

59.    Forces beyond Plaintiffs' control, such as unemployment, poverty, and the failure of Defendants to provide alternatives, including but not limited to those which may be mandated by law, have compelled Plaintiffs and other similarly situated homeless people to live, eat, sleep and store their few personal belongings in public.

60.    Defendants' above-described customs, policies, practices and conduct of confiscating and destroying Plaintiffs' personal property without warrant, probable cause, exigent circumstances, or adequate notice violate Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

### SECOND CLAIM FOR RELIEF
**(Denial of Constitutional Right to Due Process of Law in Violation
of the Fourteenth Amendment to the U.S. Constitution)**

61.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 60 above, as though fully set forth.

62.    Defendants' above-described customs, policies, practices and conduct of confiscating and destroying Plaintiffs' personal property without adequate notice, opportunity to be heard, opportunity to retrieve personal belongings, or lawful excuse or justification violates Plaintiffs' right to due process of law under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

**THIRD CLAIM FOR RELIEF**
**(Denial of Constitutional Right to Equal Protection of the Laws in Violation**
**of the Fourteenth Amendment to the U.S. Constitution)**

63.     Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 62 above, as though fully set forth.

64.     Defendants' above-described customs, policies, practices and conduct are intended and designed to single out homeless people and have the purpose and effect of depriving homeless people of their property and of driving homeless people from the City of San Diego. These policies and actions are based on Defendants' animus towards this disfavored group and/or lack a rational relationship to any legitimate governmental interest. In adopting and implementing these policies and practices with the intent to harm and disadvantage homeless persons in the City of San Diego, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**FOURTH CLAIM FOR RELIEF**
**(Denial of Constitutional Right Against Unreasonable Search and Seizure-**
**California Constitution, Article 1, § 13)**

65.     Plaintiffs reallege and incorporate here in paragraphs 1 through 64 above, as though fully set forth.

66.     Defendants' above-described customs and policies, practices and conduct of confiscating and destroying Plaintiffs' personal property without warrant, probable cause, exigent circumstances, or adequate notice violates Plaintiffs' right to be free from unreasonable searches and seizures under Article 1, § 13 of the California Constitution.

//

//

1

**FIFTH CLAIM FOR RELIEF**
**(Denial of Constitutional Right to Due Process of Law-**
**California Constitution, Article 1, §7(A))**

67.    Plaintiffs reallege and incorporate here in paragraphs 1 through 66 above, as though fully set forth.

68.    Defendants' above-described customs, policies, practices and conduct of confiscating and destroying Plaintiffs' personal property without adequate notice, opportunity to be heard, opportunity to retrieve personal belongings, or lawful excuse or justification violates Plaintiffs' right to due process of law violate Plaintiffs' right to due process of law under Article 1, § 7(A) of the California Constitution.

**SIXTH CLAIM FOR RELIEF**
**(Denial of Constitutional Right to Equal Protection of the Laws-**
**California Constitution, Article 1, § 7(A))**

69.    Plaintiffs reallege and incorporate here in paragraphs 1 through 68 above, as though fully set forth.

70.    Defendants' above-described customs, policies, practices and conduct were and are intended and designed to single out homeless people and have the purpose and effect of depriving homeless people of their property and of driving homeless people from the City of San Diego. These policies and actions are based on Defendants' animus towards this disfavored group and/or lack a rational relationship to any legitimate state interest. In adopting and implementing these policies and practices with the intent to harm and disadvantage homeless persons in the City of San Diego, the Defendants have violated the Equal Protection Clause of the California Constitution, Article 1, § 7(A).

**SEVENTH CLAIM FOR RELIEF**
**(California Civil Code § 2080 *et seq.* and Government Code § 815.6)**

71.    Plaintiffs reallege and incorporate here in paragraphs 1 through 70 above, as

1 | though fully set forth.

2 | 72.     Defendants' above-described customs, policies, practices and conduct

3 | violated California Civil Code § 2080 *et seq.*, in that, among other things, Defendants have

4 | failed to safeguard the personal property of Plaintiffs and members of the plaintiff Class

5 | found on public land, failed to inform the owners of the personal property within a

7 | reasonable time of finding this property, failed to document the property found, and failed

8 | to make restitution of the property to its owners or to make arrangements to permit them to

9 | retrieve it all of which are mandatory duties under Civil Code § 2080 et seq. for which

11 | Defendants are liable and Defendant public entities are liable under Government Code §

12 | 815.6.

## EIGHTH CLAIM FOR RELIEF
### (California Civil Code § 52.1)

15 | 73.     Plaintiffs reallege and incorporate here in paragraphs 1 through 72 above, as

16 | though fully set forth.

17 | 74.  Defendants' above-described customs, policies, practices and conduct

19 | constitute interference, and attempted interference, by threats, intimidation and coercion,

20 | with Plaintiffs' exercise and enjoyment of rights secured the Constitutions and laws of the

21 | United States and California, in violation of California Civil Code § 52.1.

## NINTH CLAIM FOR RELIEF
### (Common Law Conversion)

24 | 75.     Plaintiffs reallege and incorporate here in paragraphs 1 through 74 above, as

25 | though fully set forth.

26 | 76.     Plaintiffs were at all relevant times the owners of personal property

27 | confiscated and destroyed by Defendants as alleged above. Plaintiffs remain entitled to the

possession of their personal property. The personal property confiscated and destroyed by defendants included tents, clothing, medication, medical devices, prescriptions, personal items and documents, all of which were particularly valuable to Plaintiffs in part because these belongings amounted to much if not all of the relatively few possessions that Plaintiffs owned.

77.     Defendants' above-described customs, policies, practices and conduct denied Plaintiffs the possession of their property and constituted an unlawful conversion of that property to the possession and control of defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek relief from this Court the as follows:

1.     For an order certifying the proposed Plaintiff class, together with any necessary and appropriate subclasses, and appointing the undersigned as class counsel under Federal Rule of Civil Procedure 23;

2.     For a temporary restraining order, preliminary injunction and permanent injunction, enjoining and restraining Defendants from continuing or repeating the unlawful customs, policies, practices and conduct complained of herein;

3.     For a declaratory judgment that Defendants' customs, policies, practices and conduct as alleged herein were in violation of Plaintiffs' rights under the United States Constitution, the California Constitution, the laws of the U.S. and the laws of California;

4.     For the return of Plaintiffs' property;

5.     For nominal, compensatory, punitive and exemplary damages against the individual Defendants for the violations of federal law alleged herein, to be determined in accordance with proof;

1    6.    For attorneys fees as provided by law;

2    7.    For costs of suit; and

3    8.    For such other and further relief as the Court may deem just and proper.

4

5

6

7                                        Respectfully submitted,

8    Dated:  December 2, 2009            **DREHER LAW FIRM**

9

10                                       Robert Scott Dreher
                                         Robert Scott Norman
11

12                                            *-- and --*

13                                       **ACLU   FOUNDATION   OF   SAN
                                         DIEGO & IMPERIAL COUNTIES**
14                                       David Blair-Loy

15
                                         Attorneys for Plaintiffs
16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**



# Regional Homeless Profile 2008





SAN DIEGO

REGIONAL TASK FORCE ON THE HOMELESS, INC.
4699 MURPHY CANYON ROAD
SAN DIEGO, CA 92123
858.292.7627
WWW.RTFHSD.ORG

EXH1-001

Regional Homeless Profile                                                                 2008

# REGIONAL HOMELESS PROFILE 2008

## Acknowledgments

The annual Point-In-Time count would not be possible without the commitment and drive of the volunteers and homeless services providers who perform it. It is through their hard work and dedication that that we are able to obtain this glimpse into life on the streets of the San Diego Region.

Abby Miller, Adriana Espinosa, Aimee Castillo, Alanna Barnes, Alejandrina Dominguez, Ali Raisdanai, Amber Davis, Alisa, Allana Barnes, Allison Gulmarin, Alyssa Desind, Amanda Cicarelli, Amanda Robles, Amanda Anthony Lupian, Anthony, Andrea Alfier, Angela Bull, Anna Applefield, Anna Seymore, Anna Vrendenberg, Anthony Jefferson, April Dejesus, McDowell, Anthony Ramirez, Anthony Wilson, Antoinette Johnson, Anton Jefferson, Brian Slater, Brittney Dove, Ardle, Arturo Torres, Arty, Beverly Ahlburg, Birdean, Brandon Pullen, Carlos Thorp, Carlynn Flanagen, Carol, Bruce Higgins, Bryan Hoffman, Calty Riddle, Carlos Diaz, Catrina Skor, Cecil Harper, Cedric Turner, Christine, Scherbaum, Carolyn Vargas, Cassandra Matthews, Cheryl deblois, Christina Metzler, Christine Helsell, Craig B. Jones, Charles Biggs, Charles Donaldson, Charles Fletcher, Clarence Baker, Clovis M. Honore, Cokey Powell, Darrell Oge, Petrella, Christine Vaughan, Christopher Wafer, Dane Gadson, Daniel Manson, Daron Kamball, Dolores Welty, Craig Huntsberry, Dack, Dana Toppel, Dawn Miranda, Debra Bowman, denise bradley, Ed Zhang, Edward Flees, David A, David Pacheco, David Sanchez, Dwayne Adams, Ed Carrillo, LCSW, Emily Reed, Eric Banker, Dominick Littleton, Donetta Marritt, Elana Evans, Elia Campos, Eliza Hook, Frank Lopez, Edward Hershey, Edward Zhang, Eunice Hernandez, Evelyn Sandoval, Fatima Mejia, Gerald M. Gerald Space, Geri Garcia, Erica Johnson, Erik Behl, Erika Adams, Gena Aguilar, Gerald D. Bridges, Gerald M. Davidson, Hanh Le, Hank Cunningham, Gabriel Kendall, Gabriela Reyes, Greg Anglea, Griselda, Guillermo Davidson, Holly Hepburn, Holly Nelson, Geronimo Gungon, Gia Ramirez, Heather VanderMeulen, Herbert B., Jaes Justus, James Abbott, James, Hannah Malgapo, Hawley Woods, Irene Cardenas, Jackie Galloway, Jan R., Jared Heldebrand, Jasmine Fox, Howard Devine, IRENE CARDENAS, James Kelly, Jamie McCartin-Clayton, Jeff Bassett, Jeff Miller, Jeff, Beaman, James Justus, Jeannie Edwards, Jeff Arroyo, Jeremy Grout, Jeremy Leung, Jesse, Jeanette Armijo, Jeanette Carlos, Jennifer Lansville, Jennifer VanGrove, Jody Barnes, Joe Lager, John, Murphy, Jennifer Honick, Jimmy T. Camacho, Joan Flag, PhD, Joseph Coleman, Josh Trinchero, Peterson, Jessica Park, Jessica Yuriditski, Jorge Lopez, Karen Helbling, Karla Ramirez, Donahoo, John F. Williams, John Swan, Jon Conradi, Justin, Kika Teudt, Kim Bodle, Juanita Villalvazo, Julie Bishop, Julie Lewis, Julius Navarro, Kevin Case, Kyra Wilson, Laini Patton, Kathy Cannon, Kathy Williams, Katy Stockinger, Kenneth Carter, Krystal, Lauren Waldstein, Laurin Pause, Kimberly Platt, Krissy Finkelman, Kristen Zucht, Kristine Finkelman, Laura Stevens, Lindsay Harlin, Lisa Huff, Lance Klettke, Larry Rios, LaTasha, Laura Hansen, Lindsay Coronato, Lyndsey Scully, Lynette, Lee Inbar, Leilani T, Les Smith, Leslie Saunders, Linda Sullivan, Lucy Runyon, Marcus Fisher, Marcus Meyers, Lisa LaPorte, Lloyd H. Stark, Loren R. England, Loren Wolverton, Marc Stevenson, Mariko Killion, Mark, Pasqual, Lyzelle Atienza, Madeline Williams, Mandy Miscevic, Marie Smith, Marva Bledsoe, Mary, Margaret Wong, Maria Garcia-Lopez, Maria Icba, Maria Morgan, Martha Ferrier, Melissa Cappadona, Michael, Carpenter, Mark Parks, Marla Cruz, Marshall Rice, Mayra Campos, Mike Gram, Mike, Ferro, Matt Packard, Maureen Bell, Maureen Miller, Micheal Castaneda, Miguel Guillen, Monica Morel, Monte Primm, Neroz, Cox, Michael K. Patton, Michael Lyons, Mona Oge, Monica Martin, Pam Peterson, Patrick O'donnell, Patti Favela, Willeford, Mimi Bui, Mimi Kelley, Oan Basson, Pablo Ramirez, Penelope Henson, Philip, Phillip McLeod, Rekani, Nicky Potrey, Paul Berry, Payam Hariri Moghaddam, Randi Klettke, Randi Ludwick, Randy, Patti Hamic-Christensen, Rachel Pinuelas- Morineau, Randall Budge, Roger Taylor, Rosemarie Ang, Roxanne, Preston Wysingle Jr., Robert Bryan, Robert Smith, Scott Phelps, Scott Zindell, Sean, Richard H., Richard Lara, Sadad Ali, Sara Lantz, Sarah Walls, Sharon Mingsing, Sheri Pasanen, Stacey, Rosales, Ryan Dillon, Shanda Roberts, Shannel Halbo, Steven Genton, Steven Moeller, McCormack, Sergio Cardona, Stephan Peet, Stephanie Perone, Steve Walker, Thi Kim Vo, Thomas Haney, Thorpe, Stanley Lovelady, Suzanne S. Pohlman, Tanya, Tony Cline, Trudy, Susan Russell, Susan Yi, Susana Lopez, Toni Brown, Toni Catlin, Wayne Farrell, Wayne S, Thuy Shult, Tim Cunningham, Tim Gonzales, Victoria Steusel, Vincent Schmidlkofer, Balestreri, Velia Gitari, Veronica Llamas, Kristi Abbottt, Xavier Martinez, Zozan Berwari

Case 3:09-cv-02699-WVC   Document 1   Filed 12/02/09   PageID.32   Page 32 of 115

# REGIONAL HOMELESS PROFILE 2008

## Acknowledgments

In addition to our community volunteers and local homeless services providers, the annual Point-In-Time count would not be possible without the assistance of the following organizations:









In addition, there are many staff, consultants and volunteers that contributed to the writing, data analysis and editing of this report, including:  James Jackson, Jr., Walt Sandford, Kiefer Rich, Mary Case, Pat Leslie, Mel Takahara, and Sara McGaughey.  This was the first year RTFH routed this report to board committees and the local continuum of care to obtain feedback and to validate data contained within RHP 2008.  The routing and reading of RHP 2008 included the full RTFH board of directors, Population Estimate Committee of the Regional Continuum of Care Council, RTFH's Homeless Data Advisory and Publications Committees.

Future reports will include data from other Homeless Management Information Systems and will likely be published twice each year.

ii



Regional Homeless Profile                                                                 2008

## RTFH Board of Directors

### Officers

Rosemary Johnston, President
Mary Herron, Vice President
Jan Stankus, Secretary/Treasurer

### Directors

| | |
|---|---|
| Sue Baldwin | Kathi Houck |
| Jack Blevins | Shari Houser |
| Lynda Brophy | James Justus |
| Mary Case | Patricia Leslie |
| Marilyn Cornell | Marie McKenzie |
| Sue Christopher | Laurin Pause |
| Hannah Cohen | Simonne Ruff |
| Scott Dreher | Tom Stubberud |
| Mona Freels | Mel Takahara |
| Sister RayMonda DuVall | Carol Williams |

### Staff

Walt Sandford, *Executive Director*
Deborah Lester, *Associate Director of Programs*
Kiefer Rich, *Point-In-Time Project Manager*
Sara McGaughey, *HMIS Program Manager*
William Liu, *Training & Technical Support Coordinator*
Tiffany Moore, *Quality Control Analyst*
Kathy Cannon, *Clerical Assistant*

### Contact Information

Regional Task Force on the Homeless, Inc.
4699 Murphy Canyon Road
San Diego, CA 92123
(858) 292-7627 (phone)
(858) 292-27989 (fax)
www.rtfhsd.org (website)
taskforce@rtfhsd.org (e-mail)

**iii**



Regional Homeless Profile                                                2008

# REGIONAL HOMELESS PROFILE - 2008

### About the Regional Task Force on the Homeless

The Regional Task Force on the Homeless, Inc., has been the central clearinghouse for information on homelessness in San Diego since 1984, and was incorporated as a non-profit in 2005. Sponsored by the City and County of San Diego, the United Way of San Diego County and other local jurisdictions, the Regional Task Force addresses the issue of homelessness on a region-wide basis through statistical research, advocacy, and technical assistance. It also initiates plans and policies to alleviate homelessness.

### Mission Statement

The mission of the Task Force has been to assist local governmental jurisdictions, homeless service providers, and community groups in the development of policies, plans, resources, and programs for reducing homelessness and its accompanying conditions.

### Report Compilation

The first official Regional Homeless Profile (RHP) was published by the Regional Task Force on the Homeless (RTFH) in 1997, thus, this is the eleventh annual RHP published by the Task Force and was compiled from a physical Point-in-Time (PIT) count of sheltered and street homeless persons, which was conducted on January 31, 2008. This report also integrates data and analysis of the Street Characteristics Survey, congregate site survey, an in-depth survey of unsheltered persons and the shelter census questionnaire.

The data compiled from the shelters was extracted from the ServicePoint ™ database, which is managed locally by the Task Force, owned and operated by Bowman Systems, and located in Shreveport, Louisiana. Some data from shelter providers who do not use ServicePoint™ was obtained from the CSTAR™ database. CSTAR™ is a proprietary homeless management information system owned and operated by Father Joe's Villages in San Diego, California.

**iv**

Regional Homeless Profile                                                2008

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ............................................................................1

**INTRODUCTION** ...................................................................................4

    Counting Homeless Persons in the Nation and in San Diego.................................5

    Data Sources and Limitations ..............................................................8

**POINT-IN-TIME COUNT RESULTS**...................................................................11

    Sheltered vs. Unsheltered ................................................................12

    Homelessness by County Region and Municipal Jurisdiction...............................13

    Point-In-Time Counts - Selected Homeless Subpopulations ..............................15

    Chronic Homelessness in San Diego ....................................................15

    Gender....................................................................................17

    Race/Ethnicity............................................................................18

    Age.......................................................................................18

    Veterans..................................................................................20

    Disabilities: Mental Health and Substance Abuse ......................................21

    Domestic Violence.........................................................................24

**CONCLUSIONS** ...................................................................................26

**APPENDIX I : TABLES**...........................................................................29

**APPENDIX II : POINT-IN-TIME COUNT METHODOLOGY FOR 2008**.......................................37

    METHODOLOGY - Development.................................................................37

    METHODOLOGY - Summary ....................................................................37

    METHODOLOGY - Detail .....................................................................38

    METHODOLOGY - Limitations.................................................................37

    SURVEY - Recommendations ................................................................40

    CONCLUSION ................................................................................40

**APPENDIX III : COMMUNITY PROFILES**...........................................................41

**APPENDIX IV : CHARACTERISTICS SURVEY** .........................................................59

**APPENDIX V : HOMELESS ENUMERATION TALLY FORM** ...................................................62


## Executive Summary

A national movement to end chronic homelessness began in 2000. Along with numerous cities across America, the San Diego Region has developed a ten-year plan to end chronic homelessness, modeled after the work of the National Alliance to End Homelessness (NAEH).

For twenty-four years, the Regional Task Force on the Homeless (RTFH) has been committed to providing homeless data collection and analysis to support the greater San Diego community. The data in this *2008 Regional Homeless Profile* (RHP) is intended to inform policymaking, programming and funding decisions by local government and homeless services providers. In addition, it provides a regional rendering of homelessness that stakeholders, community members and the media can use to monitor trends.

During the fall of 2005, Point Loma Nazarene University's Center for Justice and



Reconciliation solicited help from Dennis Culhane - a nationally recognized expert on homeless enumeration - and created a research and data advisory roundtable (RADAR). The Roundtable also included San Diego State University's Institute for Public Health, and the RTFH. With funding from Alliance Healthcare Foundation, the RADAR group developed a point-in-time count methodology, which was implemented for the first time in January 2006 by RTFH. RTFH also completed point-in-time counts in April 2006, February 2007 and January 2008.

**1**

This report contains findings from the 2008 count, with minor references to the January 2006 count.

**Point in Time Survey Summary**

On January 31, 2008, 3856 persons were counted on the streets in the San Diego county region, another 3726 homeless were counted in emergency shelters and transitional housing for a total of 7,582 homeless persons.

Of the regional total, 42% percent were counted in the streets of the City of San Diego; another 13% in Encinitas and 12% in Escondido, respectively.

A self-report survey of a sample of sheltered homeless yielded the following findings[1]:

- Of the 1601 street homeless counted in the City of San Diego, 12% were estimated to be day laborers and/or farm workers;
- In the county region, approximately 77% were male and 13% female;
- Sixty percent (60%) reported being White and 20% African American;
- Eleven percent lived on the streets with a spouse and/or with children, and 6% reported being separated or divorced;
- The most common age was 40-49 years (39%), followed by 50-59 years old (22%), and 30-39 years old (14%); and 7% reported being 60-69 years old;
- There was attempt to approach or count persons appearing to be under 18 years of age due to research restrictions;
- Veterans represented more than 21% of the street population;
- Thirty-eight percent (38%) reported actively using alcohol or other drugs, and 48% rated their mental health status as fair or poor; and
- Thirty-one percent (31%) reported being houseless for more than two years, while more than 44% were homeless for more than one year.

---

[1] In the self-report surveys (n=190), no one identified themselves as Latino/Hispanic.

**2**

In 2006, the region-wide aggregate number of homeless people (sheltered and unsheltered) was estimated to be 6968. The 2008 PITC homeless estimate of 7582 represents a 9% increase from 2006.[2] In the City of San Diego, there was a 3% decline between 2006 and 2008. Whereas, in the geographic region outside the City of San Diego, that is, the other 17 cities and unincorporated areas of the county, there was a 27% increase in homeless persons from 2006 to 2008.

It is vitally important to note that the point-in-time count is a snapshot of who can be seen and counted on the streets and in emergency and transitional housing on *any given day* in the San Diego region. There are many homeless subpopulations that are well hidden. Therefore, this count doesn't capture the total population that is homeless at any point in time.

Both the point-in-time method and the sheltered self-report survey are standard tools used by jurisdictions throughout the nation to estimate homelessness. Public health and social science scholars agree that while point in time methods (i.e., point prevalence) are valuable, period prevalence methods, which measure the cumulative impact of homelessness over time within a specified geographic region offers a more dynamic view.

One resource for period prevalence data in the San Diego region is the Annual Homeless Assessment Report (AHAR) that aggregates de-identified data from two dissimilar software programs into a Regional Data Warehouse. The AHAR provides information on numbers of homeless persons over a period of one year in the San Diego Region. Using this tool, key stakeholders are able to see the homeless population over the course of a year, as opposed to one day. In 2007, the AHAR identified 7,041 unduplicated sheltered homeless persons in the City of San Diego, which is 190% greater than the 2008 PIT sheltered homeless count

---

[2] 2007 point-in-time count was complicated by poor (rainy) weather and was not an accurate reflection of the true homeless population.

**3**

EXH1-009

(2424).[3] Regionwide AHAR data is anticipated in 2009 and will allow a comparison between point and period prevalence-based estimates.

The Regional Task Force on the Homeless is committed to including a broader range of data sources and providing more details on homeless subpopulations (e.g., teens, families, veterans, etc.) in future reports. Though the Regional Homeless Profile provides a standard for benchmarking efforts to reduce the number of homeless people in San Diego communities, when possible, future reports will include more comprehensive data on homeless subpopulations as it increases value to policymakers, funders and homeless services providers.

## Introduction

Every night, over ¾ million Americans sleep in shelters or on the street, under freeway bridges, in canyons or fields.[4] Sometime during the next year, about 3½ million people will experience homelessness.[5] These persons lack a fixed, regular, and adequate nighttime residence or they live in a welfare hotel, emergency and transitional housing program or a place not ordinarily used as regular sleeping accommodations, such as cars, movie theatres, abandoned buildings, in parks or on the street.[6] People staying with family or friends and people in jail or prison are not considered homeless for the purposes of this report.

> *Sometime during the next year, about 3½ million people in the USA will experience homelessness of some kind.*

---

[3] The 2007 AHAR aggregates unduplicated sheltered homeless served during October 1, 2006 thru September 30, 2007.
[4] National Alliance to End Homelessness, "Homelessness Counts," *Research Reports on Homelessness* (January, 2007), p. 10; National Coalition for the Homeless, "How Many People Experience Homelessness," *Fact Sheet #2* (August, 2007).

[5] Martha Burt and Aron Laudan, "America's Homeless II: Populations and Services." (Presented at the Urban Institute First Tuesdays Forum, Washington, D.C., February, 2000.)

[6] United States Code, Title 42, Chapter 119, Subchapter I, §11302.

**4**

Homelessness takes different forms. Some people seek emergency housing for a short time because of a temporary crisis like a job loss, eviction or violence in their home.[7] Some may need long term transitional housing to address employment or educational deficits or to address chronic health concerns. Others may spend years on the street with severe substance abuse and/or mental illness. Nationally, the causes of homelessness most commonly cited include[8]:

- lack of affordable housing
- low-paying jobs, labor market changes
- unemployment
- mental illness
- addiction disorders
- changes and cuts in public assistance
- domestic violence

- changes in family structure
- institutional release practices
- chronic health problems
- catastrophic medical illness
- growing up in the foster care system
- lack of access to affordable health care
- lack of education

Devising appropriate strategies to assist homeless individuals in moving from the streets to shelters and permanent housing depends on accurate and timely demographic information and program evaluation. Policy planners and homeless service providers need to know the extent and characteristics of homeless persons and the capacity of the region's social service agencies to serve them. This information helps identify which prevention and intervention strategies are the best match for meeting the specific needs of the homeless in our region.

## Counting Homeless Persons in the Nation and in San Diego

Since 1970, the United States Bureau of the Census has made several attempts to count homeless persons but did not release the results because of methodological problems. On March 20-21, 1990, for example, the Census

---

[7] National Alliance to End Homelessness, "Chronic Homelessness Brief" (March, 2007).

[8] National Coalition for the Homeless, "Why Are People Homeless?" *Fact Sheet #1* (June, 2007).

**5**



Bureau conducted a count during late night and early morning hours, estimating that 228,000 lived on the streets of America.[9]  Researchers determined that this effort was incomplete and missed many unsheltered persons.    In 2000, the Census Bureau attempted to count people without conventional housing, by counting persons at soup kitchens, regularly scheduled mobile food vans, and certain outdoor locations.    But this effort was not designed to provide a comprehensive count of the homeless, resulting in a 30-year controversy of accurately counting the number of homeless people in the U.S.[10]  It is not surprising, then, that estimating the number of homeless persons continued to be highly controversial and results were often met with skepticism.

In response to this controversy, HUD created the Annual Homeless Assessment Reports (AHAR) in 2002.   In 2005, HUD began requiring regional planning groups known as Continuums of Care (CoCs) that were applying for funding under the Supportive Housing Program (SHP) to conduct point-in-time counts of sheltered and unsheltered homeless people on one night in January.[11]    One goal of this point-in-time mandate was to establish a baseline of the levels of homelessness in local CoCs.

The San Diego Regional Task Force on the Homeless (RTFH) has collected and distributed regional data on homelessness since 1984.  The first comprehensive physical street count throughout San Diego County in 2006 was supported by a

---

[9] Cynthia M. Taeuber and Paul M. Siegel, "Counting the Nation's Homeless Population in the 1990 Census."  A paper presented at the Conference on Enumerating Homeless Persons: Methods and Data Needs (Washington, DC, 1990); United States General Accounting Office, *1990 Census. Limitations in Methods and Procedures to Include the Homeless* (Washington, D.C., 1991); Diane Barrett, Irwin Anolik, and Florence Abramson. *The 1990 Census Shelter and Street Night Enumeration.* Washington, DC: United States Bureau of the Census.  There is little question that the street component of Census 1990 missed many unsheltered people, but it is impossible to say how many.

[10] Annetta C. Smith and Denise I. Smith. *Emergency and Transitional Shelter Population: 2000.* (Washington, D.C.: United States Bureau of the Census, Census 2000 Special Reports, 2001); United States General Accounting Office, *Decennial Census. Methods for Collecting and Reporting Data on the Homeless and Others without Conventional Housing Need Refinement* (Washington, D.C.: 2003)

[11] United States Department of Housing and Urban Development, Office of Community Planning and Development, *A Guide to Counting Unsheltered Homeless Persons* (Washington, D.C.:  Government Printing Office, 2004).

EXH1-012

collaborative effort between Point Loma Nazarene University's (PLNU) Center for Justice and Reconciliation and San Diego State University's (SDSU) Institute for Public Health (IPH), a group also known as the Research and Data Advisory Roundtable (RADAR). With financial support from Alliance Healthcare Foundation, RADAR created a point-in-time survey methodology. This coalition working together with San Diego's Regional Continuum of Care Council (RCCC) utilized this regional data to strengthen its annual Supportive Housing Program (SHP) submission to HUD and to attract resources needed to meet the challenge of homelessness. The San Diego Regional Homeless Management Information project (HMIS) began in 1997 with a planning group comprised of the Regional Task Force on the Homeless (RTFH), United Way and non-profit homeless service providers. The project was funded HUD's Supporting Housing Program. In 2000, ServicePoint™ was selected by the RTFH as the software system for the HMIS. In 2006, HUD

*HMIS stands for :*

**H**omeless
**M**anagement
**I**nformation
**S**ystem

funded an expansion grant to include two dissimilar software programs (Service Point™ and CSTAR™) and aggregated the data into a Regional Data Warehouse. The data warehouse constitutes unduplicated, de-identified data on homeless clients for the City, the County and the Region. The 2008 Regional Homeless Profile does not incorporate information from this data warehouse. Future reports will incorporate data from that source since it includes data from the largest provider of homeless services in the City of San Diego.

The San Diego HMIS allows agencies to enter client information at intake and then track services, such as referrals, shelter stays, goals, outcomes on all clients. The HMIS is mandated by the U.S. Department of Housing and Urban Development (HUD) for every continuum of care in the U.S. that is funded

**7**


through its Supportive Housing Program (SHP). The San Diego regional project currently has over 200 shelters and case management programs participating.

## Data Sources and Limitations

Estimates of homelessness in San Diego County have been historically based on an informal single-night count, data from homeless service providers and the opinions of experts in the field. Starting in 2006, the RTFH and its research partners responded to HUD mandates for conducting Point In Time (PIT) counts. RTFH has coordinated PIT count surveys of homeless persons in the San Diego region using standardized methodologies. HUD requires CoCs to conduct a point-in-time count of sheltered homeless people at the same time they do their street count of unsheltered homeless people. CoCs must count the number of sheltered homeless people who belong to certain (not mutually exclusive) subpopulations; people who are chronically homeless, seriously mentally ill, chronic substance abusers, veterans, persons with HIV/AIDS, victims of domestic violence, and unaccompanied youth.

In January 2006, RTFH conducted its first "one-day" count of unsheltered homeless individuals. This was followed by a count in April of that same year in an effort to crystallize the new methodology. In February 2007, the third RTFH count of street homeless persons was conducted. This report is based on the most recent "point-in-time" count, which was conducted in the early morning of January 31, 2008. Following a standard counting method (see Appendix A), over 320 enumerators fanned out across San Diego County to take the most comprehensive census of homeless persons ever attempted for our region.

Data on homeless persons in San Diego County presented in this report rely primarily on three sources. The first is a physical PIT count of homeless persons on the street. The second is an in depth characteristics survey of a sample of

**8**

unsheltered homeless persons.   The third is data extracted from HMIS on January 31, 2008.

Calculating the number of homeless who are unsheltered is challenging. [12] Enumeration difficulties include methodological variations such as differing definitions of homelessness or the timeframe used.[13]  In addition, there are practical issues involved in locating homeless individuals such as dealing with weather conditions, and recruiting and training sufficient numbers of volunteers to conduct the count.   Further, San Diego's PIT methodology for deriving the number of rural homeless or agricultural workers still depends on estimation rather than an actual count.

> **WHAT IS A POINT IN TIME COUNT?**
> A point in time count is a count of a particular group of people on any one given day.  Inherent in such a count are known limitations. Imagine if you were asked to report on the number of people living on your block and the only way you could do this was to stand in the street and count the number of people you saw.  Would you count as many people in the morning as you would late at night? Would the number be different if you counted while standing in your door or if you went out into the middle of the street? What if some of your neighbors were on vacation? Or if others had friends visiting them, would you count them? It would be easy if you could go door to door and ask your neighbors to fill in a form, but what if you have no door to knock on, no permanent place to live?

---

[12] Martha R. Burt, "Homelessness: Definitions and Counts," in Jim Baumohl (ed.), *Homelessness in America* (Phoenix: Oryx Press, 1996);  United States Department of Housing and Urban Development, Office of Community Planning and Development, *A Guide to Counting Unsheltered Homeless Persons* (Washington, D.C.:  Government Printing Office, 2004).  For an analysis of these issues for one geographic location, see Institute for the Study of Homelessness and Poverty, Weingart Center, "Homelessness in Los Angeles," *Just the Facts* (August, 2004), p. 1.

[13] The definition of homelessness has a major bearing on who is included in this study.  Different definitions mean that information on different kinds of homeless persons would be collected.  Section 11202 of the McKinney-Vento Homeless Assistance Act (Title 1, Section 103) defines a homeless person as an individual who lacks a fixed, regular and adequate night-time residence or a person who resides in a shelter, welfare hotel, transitional program or place not ordinarily used as regular sleeping accommodations, such as streets cards, movie theaters, and abandoned buildings.  This is the most commonly used definition of homeless and is applied in this report.

     However, HUD also defines homeless to include a person who has no place to go, no resources to obtain housing, and is either being evicted within a week, discharged within a week from an institution (e.g., [prison, hospital, etc), or is fleeing domestic violence.  See United States Department of Housing and Urban Development, *ESG Deskguide*, Section 4.4.

     Another definition is offered by the United States Department of Education.  Its definition of homeless is more expansive and includes children and youths "who are sharing the housing of other persons due to loss of housing, economic hardship, or similar reasons" or are living in "motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations . . ." See the McKinney-Vento Homeless Education Assistance Improvement Act of 2001, Subtitle B, Section 725.

**9**

## Data Analysis and Reporting

The development and implementation of the RTFH HMIS (*ServicePoint™*) and collaboration with Father Joe's Villages HMIS (*CSTAR™*) has enabled San Diego's homeless service providers to access more complete data on homeless persons over time. This combined data set allows the San Diego region to report

> **POINT PREVALENCE**
> The proportion of homeless people at one point in time, usually one day.
>
> **PERIOD PREVALENCE**
> The proportion of homeless people over a period of time, usually of over the course of one year.

on both PIT and over the course of one year.  More information about the City of San Diego's period prevalence data is available in the Annual Homeless Assessment Report (AHAR) report, which is available online at www.rtfhsd.org. The capacity to report period prevalence homeless data for the San Diego county region is currently in process.

Data coverage and data quality in the regionwide (RTFH) HMIS has improved during the past two years but the system still has some limitations.  Limitations include inaccurate, or incomplete data entry by service providers or data not entered in a timely manner, and includes non-participation from shelter providers in the HMIS system.

Despite these limitations, the information collected by PIT enumerators and data entered into the regionwide HMIS are considered the most accurate data available for the analysis of San Diego's regional homeless population. For this report, data from the PIT street count, the unsheltered survey, and Service Point™ is laid out in various statistical tables and charts.  Several important assumptions were made in this process.

**10**

First, assume that the in-depth survey of the sample of unsheltered homeless is representative of all street homeless and their demographic profile is projected to give proper statistical weight in any data table.   Though the methodology recommends interviewing every fourth person, those selected to participate in this in-depth interview were selected in randomly.  It should also be noted that a sample of 190 surveys represents less than 10% of the total population which limits the ability to apply this data to the general homeless population counted.

The RTFH's HMIS includes data from most of the City of San Diego's emergency shelters and transitional facilities in the region, covering an estimated 68.5% of homeless beds in the San Diego county region. The HMIS demographic client profile was projected onto all sheltered homeless in order to give them proper statistical weight in any data table.

The reader of this report should recognize that there may be impacts to the precision of the results presented. For example, extrapolation of the demographic characteristics could result in an inaccurate depiction of veteran's data since historically counts of homeless veterans have been higher in the central region.

## Point-In-Time Count Results

The PIT counts in San Diego County offer a "snapshot" of homelessness on a single night only and include estimates of the number of homeless persons within particular subpopulations, such as persons who are chronically homeless, severely mentally ill, substance users, veterans, and unaccompanied youth were accounted for that day.

**11**

On January 31, 2008, 3,856 homeless persons were counted on the streets throughout the region, and an additional 1,009 in an emergency or seasonal shelter and 2,717 living in a transitional facility. A total of 7,582 homeless persons were accounted for on that one morning throughout the county region (see Table 1).

> **BED VERSUS CLIENT.**
> A bed is a measure of the capacity of a shelter on any given day. Whereas, a bed can be used by more than one client over a period of time.

Estimates of homelessness in this report may be viewed as benchmarks for understanding trends in future RTFH reports. The benchmarks in this report include the total number of sheltered and unsheltered persons on a single night; the proportion of individuals versus families; the proportions in selected political jurisdictions that are homeless; and the size of certain homeless subpopulations. Future RTFH reports (e.g. on homeless veterans) will investigate further the issues represented by these benchmarks in order to understand how they relate to the changes over time in homelessness.

Sheltered vs. Unsheltered

On the morning of January 31, 2008, 7,582 homeless persons were counted in San Diego County. (see Table 1 and Chart 1)  Although life on the streets, in the canyons and parking lots, and along the freeways of our region is precarious, uncomfortable, violent and insecure, more than half (3,856) of the region's homeless were found there. An additional 36 percent (2,717) were residents in transitional housing facilities. The remaining 13 percent (1,009) slept in emergency shelters.

There have been changes in the size of the homeless population and in their housing distribution since early 2006.  In the past two years, the number of

**12**

homeless counted increased by nearly nine percent (9%), and the proportion of all homeless who lived on the street increased from 44 % to almost 51%. When



**Chart 1**
**Housing Location of the Homeless Population**
**for San Diego County: January 31, 2008**

Living in Emergency Shelters 13.30%

Living on the Street 50.90%

Living in Transitional Housing 35.80%

looking at this trend it is important to note that there were more volunteers counting in more areas in 2008 versus 2006 which may account for part of this increase. (see Table 2) [14]

When compared to the nation as a whole, fewer San Diego homeless were housed in emergency shelters or transitional facilities (49%) than in the rest of the country (58%) on enumeration day.[15] There is a noticeable difference between the demographics of the street/emergency shelter population and residents of transitional housing programs (see Table 7).  Those who live on the street/emergency shelters were most likely to be middle-aged, white males.  In contrast, residents of transitional housing programs, although likely to be white middle-aged men, are just as likely to be children.

Homelessness by County Region and Municipal Jurisdiction

Homeless individuals and families can be found throughout San Diego County, although there are significantly different regional distribution patterns.  This can

---

[14] It is possible that the efforts of more and better-trained enumerators affected the count of street population.  There were 190 enumerators in 2006 and 320 in 2008.  More eyes may have resulted in spotting more street homeless.  However, in 2008, enumerators followed the same counting protocols as two years previous.  And the geographic area covered was virtually identical in both census years.  Thus, it is likely that the numbers of homeless reported in 2008 were not increased simply by having more and better-trained enumerators.

[15] National Alliance to End Homelessness – Homelessness Counts.  The Homelessness Research  Institute of NAEH Jan 2007. P11.

**13**

EXH1-019

be clearly seen when comparing San Diego County Supervisorial Districts 1 and 4 that focus on the core urban areas with Districts 2 and 5 that encompass more rural northern and eastern areas[16] (see Table 3).

More than half (53.8%) of the region's homeless individuals live in the City of San Diego (see Table 4). Whereas, 35.5% of the regional homeless population can be found in Supervisorial District One, which includes the communities of Pacific Beach, Ocean Beach and the Downtown area (see Table 5).

San Diego City Council District 2 had the highest concentration of homeless in emergency shelters and homeless programs (see Table 6). However, the downtown winter shelter is located in District 2. The greatest incidence of visible street homeless persons was found in Encinitas and in the Pacific Beach, Ocean Beach and Downtown area of the City of San Diego, followed by Escondido.

On the other end of the scale, some municipalities and communities virtually have no visibly homeless residents. The street count documented only 195 homeless persons in the combined areas of Solana Beach, San Marcos, Carlsbad, Del Mar, Poway, and outlying areas of the City of San Diego (Rancho Bernardo, Scripps Ranch, Mira Mesa, University City, Carmel Valley, San Carlos, La Jolla). The PIT count numbers of documented homeless persons in the municipalities are only a portion of the number of homeless persons seen throughout the year. For example, the

*It is safe to assume that the Point in Time Count results estimate the least number of homeless individuals.*

---

[16] The National Survey of Homeless Assistance Providers and Clients (NSHAPC), conducted in 1996, found that 44 percent of homeless clients left the communities where their current spell of homelessness began and that most moved from smaller to larger communities, particularly to central cities. Clients frequently cited job loss and loss of housing as reasons for the move. Martha Burt, Laudan Y. Aron, Edgar Lee, and Jesse Valente. *Helping America's Homeless.* (Washington, DC: The Urban Institute Press, 2001), p. 37.

**14**

2008 PIT count (7,582) provides evidence of the least number of homeless persons region wide but the actual number is considerably higher. This becomes clear when we look at other sources.

For example, the City of San Diego AHAR documents 7,041 different individuals in a 12-month period, whereas the PIT count identifies only 4,082 in the City on the day of the count. The AHAR figure does not include persons served in County shelters or in non-homeless facilities such as jails, hospitals, substance abuse treatment facilities, or persons on the street. In this case, period prevalence data corroborates that the PIT count (7,582) is only a minimal estimate of the homeless population in the county region. Further, period prevalence data demonstrates that the total number of persons who are homeless in any 12-month period is likely to be significantly higher. By comparison, national data indicates that approximately 0.5% of the total urban population are homeless on any given day. For the San Diego county region, with an estimated population 2.6 million[17], using this national indicator, the estimated homeless population in the San Diego county region would be approximately 16,000.

## Point-In-Time Counts - Selected Homeless Subpopulations

*Chronic Homelessness in San Diego*

Although effective public policy depends on accurate data on the chronically homeless, collecting such information from the RTFH's PIT counts is difficult. HUD defines a person as being chronically homeless if they are an unaccompanied individual with a long term disabling condition who has been homeless for a year or more or has had at least four episodes of homelessness during any three year period.[18] Counting unsheltered persons who are

---

[17] January 2008 population data retrieved from San Diego Association of Governments (SANDAG).

[18] A disabling condition includes substance abuse, serious mental illness, chronic physical illness, and/or developmental disability. See United States Department of Housing and Urban Development, Office of Community Planning and Development and the Office

**15**



chronically homeless is particularly challenging because the count is conducted during early morning hours when most of the homeless are asleep and its not possible to know if they meet the HUD definition of chronic homeless.

San Diego's high-priced rental market, low-wage jobs, and the general lack of access to health care are key contributing factors to homelessness. For individuals struggling to pay the rent, the addition of a serious illness or disability can start a downward spiral into homelessness. Many cannot afford healthcare. In 2008, approximately 46 million Americans had no health care insurance. The downward spiral can continue for years until a person eventually becomes one of the chronic homeless.

Nearly 24 percent of San Diego's unsheltered and sheltered homeless population can be classified, based on HUD's definition, as "chronically homeless." (See Table 7 and Chart 2 below). However, when surveyed, 45 percent of those living in emergency shelters reported being "chronically homeless." Currently, less than 15% of homeless persons in transitional housing facilities in the county region are classified as "formerly chronic homeless." This is higher than the national figure of 18 percent.[19] According to the sheltered census, 23.7% of the sheltered homeless are classified as chronically homeless. This group of nearly 1,800 homeless San Diegans spends long periods of time, often years, either living in shelters and on the streets, or cycling between hospitals, emergency rooms, jails, prisons, and mental health and substance abuse treatment facilities.[20] Furthermore, they are very costly to public systems of care.

---

of Special Needs Assistance Programs, *Defining Chronic Homelessness: A Technical Guide for HUD Programs* (September, 2007), p. 3.

[19] United States Department of Housing and Urban Development, *The Third Annual Homeless Assessment Report to Congress* (Washington, D.C.: Office of Community Planning and Development, 2008), p. 12.

[20] National Alliance to End Homelessness, "Chronic Homelessness Brief," *Fact Checker* (March, 2007), p. 1-2; Dennis P. Culhane, Stephen Metraux, and Trevor Hadley, "Public Service Reductions Associated with Placement of Persons with Serious Mental Illness in Supportive Housing," *Housing Policy Debate* 13 (2002), p. 107-163.

**16**

Nationally only one-third of the chronic population is able to find shelter. [21]  In 2004, the City of San Diego made ending chronic homelessness a major public policy goal.  San Diego County United Way became the convener for the development of a plan to end chronic homelessness in the San Diego region.  The development of the plan included participation by homeless service providers, academic experts, developers, hospital administrators, police and the interested public.  A Leadership Council was established to implement the plan incorporating the Housing First/Housing Plus model.  The P-TECH plan was published in 2005 and is in its implementation phase.

> **Two out of three homeless persons counted were male.**

### Gender

Two out of three homeless persons counted were males even though the County's general population is divided evenly between males and females.  This predominance of males is reflected in their overwhelming preponderance on the street (79.5%) and in emergency shelters (63.7%).  By contrast, females make up less than one-third of the total homeless population (32.5%) and only 20 percent of those living on the street.



Chart 2
Proportion of Chronic and Non-Chronic Homeless
for San Diego County: January 31, 2008

Chronic Homeless Persons 23.70%

Non Chronic Homeless Persons 76.30%

Gender distribution among those living in transitional programs are divided nearly evenly between males and females (51.9% vs. 48.1%).   This

---

[21] See United States Department of Housing and Urban Development, *The Third Annual Homeless Assessment Report to Congress* (Washington, D.C.:  Office of Community Planning and Development, 2008), p. 16 for national data.  The San Diego experience may reflect the impact of the REACH program that is specifically designed to provide supportive housing for homeless persons with a dual diagnosis.

**17**



demographic ratio may be an indication that these types of transitional programs offer a larger number of beds designated for individual women or mothers and their minor children, relative to their share of the homeless population. This gender balance reflects the number of beds set aside for the specific target populations. .

### Race/Ethnicity

Two ethnic or racial groups are disproportionately represented among San Diego's homeless. African-Americans comprised 5.4 percent of the local general population but 18.1 percent of the homeless population. This fact reflects a national trend as well.[22] The incidence of homelessness among Whites was higher than might be expected from their numbers in the general San Diego population. While whites comprised 51.6% of the general population, they account for nearly 60% of the homeless population. (see Table 7).

By contrast, the proportion of homeless Hispanic/Latino individuals or those who belong to other races (Asian, Native American, and other) was lower than the percentages of people in these racial/ethnic groups in the County population as a whole. (see Table 7)

### Age

The greatest percentage of all homeless individuals is in the 31-50 age range (44.8%). In contrast, this group represents only 29.9% of the general population. Young adults 18-30, comprised 18.2 % of the County general population but only 10.4 percent of all homeless (see Table 7).

---

[22] United States Department of Housing and Urban Development, *The Third Annual Homeless Assessment Report to Congress* (Washington, D.C.: Office of Community Planning and Development, 2008), p. 24-5, 29.

**18**

> **SOCIAL SECURITY**
>
> A social safety net for people in their mid-60s or older that includes Supplemental Security Income (SSI), Social Security, Medicare, meal programs and public and other assisted housing for seniors, may help reduce homelessness rates among vulnerable older single individuals. Nevertheless, older low-income persons, as a group, possess the characteristics that often generate homelessness.

Homeless youth (under 18 years of age) are difficult to track because of their highly transient nature, their distrust of adults, and their distrust of public services, which is usually born out of fear of being incarcerated or institutionalized.[23]   They tend to concentrate in urban areas and on the coast where they easily blend with other youth. Data for these children exists only for those living in emergency shelters or transitional facilities.  Youth under 18 comprise 25.1 % of the County general population but only 16 % of the homeless in shelters and transitional housing programs (see Table 7). According to the agency census, children and teens, with or without their parents, made up the largest proportion (about 40%) of those who lived in transitional housing.

Homeless ages 51-61 years represent 16.8% of both sheltered and unsheltered homeless. When combined with seniors age 62 and over, who comprise another 6.1%, persons 50 years and over collectively represent 23% of the aggregate homeless, though only 13.6% of the County general population.

> *One out of twenty homeless persons counted was a senior.*

---

[23] National Coalition for the Homeless, *Homeless Youth: NCH Fact Sheet #13.*  June 2005.

**19**


Homelessness has been demonstrated to reduce the life expectancy of seniors.[24] Factors that may contribute to homelessness among seniors include: isolation poverty, and high incidence of chronic conditions such as mental illness (e.g. depression) or alcoholism and deteriorating physical health and functioning. The immediate precipitant tends to be eviction for failure to pay rent. The elderly living in congregate housing fare better, probably because of established relationships and social interactions common in such living situations.[25] Those living alone without family or social support systems appear to be the most vulnerable to homelessness.

Once on the street, elderly homeless persons often find it difficult to get around, and as they remain suspicious of the crowds at shelters, they are more likely to sleep on the street. For this reason, the elderly homeless population may also be consistently undercounted due to their reluctance to stay in shelters.[26]

*Veterans*

Studies in the 1980's and early 1990's reported that homeless veterans were more likely to have been in jail, had substance abuse issues or been hospitalized for psychiatric disorders than homeless non-veterans[27]. However, more recently, it is believed that veterans who become homeless do so through the same factors as non-veteran homeless; poverty, joblessness, mental illness and

---

[24] S.M. Barrow, D.B. Herman, P. Cordova, and E.L. Struening. "Mortality among Homeless Shelter Residents in New York City," *American Journal of Public Health* (1999). pp. 529-534; J. R. Hibbs, L. Benner, Lawrence, B., R.S. Klugman, I. Macchia, A. K. Mellinger, and D. Fife. "Mortality in a Cohort of Homeless Adults in Philadelphia," *The New England Journal of Medicine*, 331(1994): 304-309.

[25] Brickner, Philip W. *Under the Safety Net: The Health and Social Welfare of the Homeless in the United States.* W.W. Norton & Company. New York: 1990.

[26] National Coalition for the Homeless, *Homelessness Among Elderly Persons: NCH Fact Sheet #15.* June 2006.

[27] State of California, Department of Veterans Affairs, California Veterans Board, *A Study on the Status of Homeless Veterans in California* (2002), Chapter 7.

**20**

substance abuse.[28]  Nearly 20 percent of all adult homeless San Diegans served in the armed services.  This indicates that veterans are at particularly high risk of homelessness when compared to the total national adult population (among whom 10 percent are veterans).[29]  Underscoring this observation is the fact that nearly one-third of San Diego's emergency shelter residents were veterans.

*Families*

Nationally, the overriding characteristic of homeless families is their relative poverty.  To complicate the stigma of poverty, the evolving nature of child protection and immigration laws leads many homeless families to be well-hidden, and therefore, hard to count or survey.  In San Diego, the data set used to account for homeless families in San Diego is the emergency and transitional shelter data.  However, the only data used for this count is through the ServicePoint™ database.

During the time of the PIT count, there were 523 homeless families comprising a total of 1282 persons in the San Diego county region.  Of these, 250 (48%) families were found in shelters in the City of San Diego, representing a total of 557 family members living in emergency or transitional shelters.  Single mothers made up 89% of the homeless families in the county region, and 86% of families in the City of San Diego.  Of the total homeless households living in county shelters, 56% (713) were comprised of children under 18 years old.

Of the total homeless family members, 58% were white, 10% were African-American and 42% identified themselves or their children as Hispanic.  Homeless

[28] Special Populations of Homeless Americans. (August 1999) The 1998 National Symposium on Homelessness Research. U.S. Department of Housing and Urban Development and the U.S. Department of Health and Human Services. ( http://aspe.os.dhhs.gov/progsys/homeless/symposium/2-Spclpop.htm )

[29] National Coalition for the Homeless, "Homeless Veterans," *Fact Sheet* #14 (August, 2007); Mary Cunningham, Meghan Henry, and Webb Lyons, *Vital Mission: Ending Homelessness among Veterans* (Washington, D.C.: National Alliance to End Homelessness, 2007); National Coalition for Homeless Veterans, "Homeless Veterans Fact Sheet" (n.d.) http://www.nchv.org/docs/HomelessVeterans_factsheet.pdf. In Los Angeles, veterans represent around 14% to 20% of the homeless population, compared with 9% of the overall county population. Institute for the Study of Homelessness and Poverty at the Weingart Center, *Homelessness in Los Angeles: A Summary of Recent Research* (2004), p. 15.

**21**

families cited domestic violence as the primary reason (30%), with addiction as the second most common reason for homelessness (13%). Six percent (6%) cited they were unable to pay rent or mortgage as their reason for being homeless and forty percent (40%) of parents reported drug addiction as a disability.

Homeless families in San Diego share similar characteristics with homeless families throughout the U.S.; they are often headed by young, single moms with limited education. A challenging issue facing many of these families who are either homeless or on the brink of homelessness is the downward spiral in the nation's economy and the limited availability of living wage jobs. The increasing prevalence of domestic violence will also lead to more families on the street. Given the current economic recession and housing challenges in the San Diego county region, it is anticipated that more families will fall into homelessness.

*Disabilities: Mental Health and Substance Abuse*

There has historically been a strong correlation between homelessness and the disabling effects of mental illness and substance abuse. There is also a close correlation between mental illness and substance abuse, with both conditions co-occurring in many individuals. It is estimated that nationally, nearly half of the homeless suffer from mental illness, with half of those (25%) experiencing serious mental health disorders such as chronic depression, bipolar disorder, schizophrenia, schizoaffective and severe personality disorders. In comparison, 2004 studies showed that approximately 4% of the U. S. population suffered from serious mental illness. This means that nationally, the incidence of serious mental illness among the homeless was five times that of the general population. Similarly, it has been estimated that half of all homeless adults nationally have substance use disorders [30]. This is in contrast with a 2005 estimate that 9.1% of the U. S. Population aged 12 or older were classified with "substance

---

[30] *Blueprint for Change*, 2003, CMHS, SAMHSA

**22**

dependence in the past year".  In other words, the incidence of substance abuse among the homeless might be five times that of the general adult population.

The proportion of homeless persons recovering from substance abuse is higher (between 51% and 72%) among those residing in transitional housing. In a 2000 national study, nearly a quarter of homeless persons admitted for substance abuse treatment had co-occurring psychological disorders.[31] For both subgroups and those who are dually diagnosed, in addition to these underlying conditions, there are many compounding issues such as self-medication, self-denial of a problem, shame and ostracism, isolation and boredom, displacement from natural support systems, lack of health insurance, treatment side-effects, lack of assessment and case management services, and social scapegoating. Additionally, new welfare and Social Security Disability income regulations concerning alcohol and drug abusers severely limit, and in most cases, eliminate this group's eligibility for such assistance.  Consequently, many mentally ill and addicted individuals find themselves episodically or chronically homeless and dependent upon emergency shelters, day programs, soup kitchens and other charitable resources for their welfare.

The 2008 PIT shelter survey reveals that 23.9% of homeless adults in San Diego County reported mental illness as a disability.   This is lower than the reported rate of mental illness among the homeless nationally.  This incidence rate did not vary much between the street population and those who were in emergency shelters or transitional housing, except for those who were in permanent supportive housing units specifically reserved for the mentally ill.  In addition, survey results showed that among those who report a disability, 29.9% reported drug abuse and 36.9% reported alcohol abuse.

---

[31] *The DASIS Report: Characteristics of Homeless Admissions to Substance Abuse Treatment*, 2000,  Drug and Alcohol Services Information System. DASIS. SAMHSA. OAS.  (conform to proper footnote format).

**23**

The fact that the survey results show a slightly lower rate of mental illness among the homeless in San Diego than the homeless national rates, is due in part to the fact that the PIT survey data includes only those who report having a disability.  These figures do not include those who do not claim to have a disability, or who are unaware of, or are in denial about their mental illness.  It is expected that there is similar under-reportage of disability due to substance abuse.

### Domestic Violence

Most research on domestic violence has primarily focused on women and their children.  For women in the United States between the ages of 15 and 44, domestic violence is the single largest cause of injury.[32] There is no typical victim of domestic violence.  Women of all ages, races, socioeconomic classes, and educational backgrounds experience domestic violence from husbands, boyfriends, lovers, or partners.

Nationally, 44% of homeless families identified domestic violence as a primary cause of homelessness.[33]  However, the numbers of homeless domestic violence victims may be underestimated because some victims are reluctant to self-report. Homeless women seldom view abuse as their primary problem and may not reveal that they are victims.  Feelings of shame or fear may also inhibit self-reporting.   There is also a portion of the general population who live with the domestic violence in order to avoid becoming homeless.  Furthermore, some victims of domestic violence move out of their homes and in with friends or

---

[32] American College of Emergency Physicians *Domestic Violence Facts Sheet*. 24 June 2004. American College of Emergency Physicians. June 2003.

[33] United States Conference of Mayors. *A Status Report on Hunger and Homelessness in America's Cities: A 25-City Survey 2002*, December 2002, p. 82. Also see National Law Center on Homelessness and Poverty, "Some Facts on Homelessness, Housing and Violence Against Women," *Fact Sheet* (2008).

**24**

relatives where they find support. And while the support is good for them, the abuser is likely to look for them there first.   They may remain unserved and uncounted.

Physical or mental assault among family members can lead to sudden changes in housing options – making someone homeless virtually overnight[34] – a significant proportion of those living in emergency shelters and transitional programs reported that they were victims of domestic violence. Data from the PIT on domestic violence victims for San Diego exists only for emergency shelters and transitional housing.   The data indicates that domestic violence was reported by 20.2% of all residents in these housing settings.

> *The address of shelters for victims of domestic violence must be kept confidential in order to protect the clients.*

Female victims of domestic violence in homeless shelters represent only a fraction of the number of battered women in the general population. Women fleeing abuse and other threats at home have had difficulty finding refuge in public shelters that serve the general homeless population.   General homeless shelters do not function as a "safe house" whose location is kept confidential. For security reasons, a woman's (and her children's) whereabouts may need to be kept secret from her abuser.   Potential danger is not taken lightly; studies indicate that the largest number of domestic violence related murders occur after a woman has left her partner.

---

[34] National Coalition for the Homeless, "Mental Illness and Homelessness," *Fact Sheet* #7 (August, 2007).  There is evidence of a correlation between homelessness and certain childhood experiences, including poverty and residential instability, such as foster care, sexual abuse, and family problems. Judith Stein, M.B. Leslie, Adeline Nyamathi, "Relative Contributions of Parent Substance Use and Childhood Maltreatment to Chronic Homelessness, Depression, and Substance Abuse Problems among Homeless Women:  Mediating Roles of Self-esteem and Abuse in Adulthood," *Child Abuse and Neglect*, Vol. 26, Issue 10, October 2002; Paul Koegel, Elan Mclamid, Audrey Burnam, "Childhood Risk Factors for Homelessness among Homeless Adults," *American Journal of Public Health*, Vol. 85, Issue 12, December 1995; Interagency Council on the Homeless, *Homelessness: Programs and the People They Serve, Findings of the National Survey of Homeless Assistance Providers and Clients.*

**25**

Victims of domestic violence have many of the same barriers as the general homeless population (mental health, substance abuse, limited or no income, limited employment skills) and have the additional barriers of trauma recovery from the abuse, acting out behaviors of children, and limited social supports. Additionally, victims of domestic violence benefit from facilities that are trained specifically for dealing with the complexities of domestic violence.

## Conclusion

The salient finding of this report is that 7,582 is the most reliable count of homeless persons on any given day in the San Diego county region, whether living on the street or in a shelter. Unquestionably, it the least number of actual homeless but because many are hidden and not counted, the actual number is hard to define.

Winter shelters are established in three regions of the county to meet the growing demand for homeless services during the inclement weather between December and April each year. The total number of winter shelter beds is estimated at 623. On the night of the PIT count, over 3856 people were counted on the streets of the county region, and thus, represents a 3200-bed shortage.

On any given night, agencies serving San Diego's homeless can provide emergency or transitional housing for about 2,700 individuals – only about one-third of the total need. Based on a bare minimum estimate of the PIT count of 7,582 persons, the housing needs of only 38.1 percent of our region's homeless can be met currently. When winter shelters are open, an additional 623 (13%) can be assisted. At the most, then, less than half of the homeless population (46.3 percent) will find shelter of any kind if every bed was occupied.

**26**

Because some beds were reserved for various homeless subpopulations and others were open to any homeless person, this shortage is not shared by different groups of homeless equally. (See Table 7) For example, the needs of females could be met by the current housing inventory better than those for males, especially in the non-winter months (41.0 percent vs. 36.7 percent in non-winter months; 47.5 percent vs. 45.7 percent in winter months).35

Those agencies that provide specific rehabilitation programs for those homeless caught up in drug addiction problems and/or alcohol-related issues can make 927 beds available. But that is only 48.7 percent of the need for drug treatment. Because there are more homeless reporting problems with alcohol, only 39.4 percent can find the help they need. However, the mentally ill homeless are the worst off. Only 10.6 percent can be helped through programs specifically designed to assist them.36

It is harder to estimate the unmet need for victims of domestic violence. However, some understanding of the gap between need and resources can be gathered by looking at the sheltered population. According to the RTFH housing inventory, San Diego agencies provide 138 beds specifically targeting homeless individuals who have been traumatized by domestic violence. But 725 sheltered persons in the county region identified themselves as part of this group.

---

[35] The RTFH housing inventory charts indicate that some beds were reserved exclusively for use by females or males. However, many beds could theoretically be utilized by either gender. For the purposes of this report, two-thirds of all "open" beds were assigned to males and one-third to females, reflecting the homeless sex ratio.

[36] According to San Diego County Mental Health officials, there are 616 treatment beds available to the County's 1,073,764 low-income persons. (For a report on low-income persons, see a SANDAG report found at http://sandag.org/uploads/publicationid/publicationid_1379_8380.pdf.) The homeless make up only 0.706 percent of the low-income population. If these 616 beds are assigned according to the proportion of homeless among all low-income San Diegans, homeless individuals with mental illness are potentially eligible for 4 of these beds. However, the San Diego REACH program (Reaching Out and Engaging to Achieve Consumer Health) is an affordable housing initiative specifically designed for individuals with special needs, particularly those with mental illness. They have 188 beds available. Thus, when combined, these two housing treatment options yield 192 beds for mentally ill homeless persons.

**27**

### Next Steps

The following amendments to this process will not only paint a clearer picture of homelessness in the region but also identify key services and programs that can get more homeless off the street. For example, application of the *Housing First* case management methods within the seasonal shelter system will assist in capturing the key services that will increase the rate of individuals and families moving from being homeless to housed.

Other next steps that will augment this report include:

- Acquire more PIT surveys
- Collect trend data
- Collate separate subpopulation reports
- Expand database capacity for period prevalence data
- Using data warehouse elements
- Creating county expansion of AHAR

Regional Task Force on the Homeless (RTFH) is committed to continue performing the PIT count, managing the Servicepoint™ database, conducting surveys and subpopulation reports, in its role as regional homeless information system manager. In the future, RTFH will work more closely with SDSU's Institute for Public Health to ensure accurate data analysis, and other academic institutions, as appropriate, to standardize the reliability of the datasets collected and constantly improve presentation and application of data in future publications.

**28**



Regional Homeless Profile                                                    2008

## Appendix I : Tables

### Table 1

Number of Homeless Persons by Shelter Status (by City)
January 31, 2008

| City | Street Count | Emergency Shelters | Transitional Housing | Total | 2007 Estimated Population* |
|---|---|---|---|---|---|
| Carlsbad | 22 | 17 | 0 | 39 | 101,337 |
| Chula Vista | 205 | 1 | 254 | 460 | 227,723 |
| Coronado | 30 | 0 | 0 | 30 | 22,957 |
| Del Mar | 2 | 0 | 0 | 2 | 4,548 |
| El Cajon | 209 | 70 | 82 | 361 | 97,255 |
| Encinitas | 530 | 6 | 10 | 546 | 63,259 |
| Escondido | 466 | 101 | 242 | 809 | 141,788 |
| Imperial Beach | 53 | 0 | 0 | 53 | 27,709 |
| La Mesa | 57 | 0 | 0 | 57 | 56,250 |
| Lemon Grove | 30 | 0 | 0 | 30 | 25,451 |
| National City | 175 | 24 | 0 | 199 | 61,115 |
| Oceanside | 115 | 70 | 151 | 336 | 176,644 |
| Poway | 28 | 0 | 0 | 28 | 50,830 |
| San Diego | 1,658 | 696 | 1,728 | 4,082 | 1,316,837 |
| San Marcos | 19 | 0 | 0 | 19 | 79,812 |
| Santee | 43 | 0 | 0 | 43 | 55,158 |
| Solana Beach | 1 | 0 | 0 | 1 | 13,418 |
| Vista | 112 | 24 | 250 | 386 | 94,962 |
| Spring Valley | 101 | 0 | 0 | 101 | |
| **Total** | **3,856** | **1,009** | **2,717** | **7,582** | **2,617,053** |

* data retrieved from Sandag 2008

**29**

Regional Homeless Profile  2008

**Table 2**

Housing Status of Homeless Persons
PIT Comparison of 2006 and 2008

| Housing Status | 2006[37] | 2008[38] | Percent Change from 2006 to 2008 |
|---|---|---|---|
| Street Population | 3,033 | 3,856 | 27.10%* |
| Emergency Shelters | | 1,009 | |
| | 3,935 | | -5.30%** |
| Transitional Housing | | 2,717 | |
| **Total** | **6,968** | **7,582** | **8.80%** |

---

[37] San Diego Point In Time Count conducted on January 31, 2006
[38] San Diego Point In Time Count conducted on January 30, 2008

EXH1-036



Regional Homeless Profile                                                           2008

**Table 3**

Percentage of Homeless Persons by Housing Status and Supervisorial District
January 31, 2008

| District | Housing Status | | | | Concentration per 10,000 | | |
| | Street Population % | Emergency Shelters % | Transitional Housing % | Total % | Street Homeless | Sheltered Homeless | Total |
|---|---|---|---|---|---|---|---|
| District 1 | 23.2 | 45.3 | 49.4 | 35.5 | 13.89 | 27.91 | 41.81 |
| District 2 | 12.1 | 6.9 | 3 | 8.2 | 8.09 | 2.63 | 10.72 |
| District 3 | 29.3 | 10.6 | 11.2 | 20.3 | 17.76 | 6.47 | 24.23 |
| District 4 | 27.9 | 26.2 | 21.7 | 25.5 | 17.32 | 13.72 | 31.04 |
| District 5 | 7.4 | 11 | 14.8 | 10.5 | 4.31 | 7.68 | 11.99 |
| County Total | **100** | **100** | **100** | **100** | | | |
| (N) | (3,856) | (1,009) | (2,717) | (7,582) | | | |

**31**

Regional Homeless Profile                                          2008

## Table 4

Percentage of Homeless Persons by Housing Status and Sub-region
January 31, 2008

| Regional Area | Housing Status | | | | Concentration per 10,000 | | |
|---|---|---|---|---|---|---|---|
| | Street Population % | Emergency Shelters % | Transitional Housing % | Total % | Street Homeless | Sheltered Homeless | Total |
| San Diego City Coastal | 43 | 69 | 63.6 | 53.8 | 12.59 | 18.41 | 31 |
| North County | 17.4 | 9.2 | 5.9 | 12.2 | 18.65 | 7.07 | 25.72 |
| Inland North County | 16.2 | 12.4 | 18.1 | 16.4 | 17.01 | 16.79 | 33.81 |
| East County | 11.4 | 6.9 | 3 | 7.8 | 18.79 | 6.49 | 25.29 |
| South Bay | 12 | 2.5 | 9.3 | 9.8 | 13.64 | 8.22 | 21.86 |
| **Regional Total** | **100** | **100** | **100** | **100** | **14.73** | **14.24** | **28.97** |
| (N) | (3,856) | (1,009) | (2,717) | (7,582) | | | |

**32**

EXH1-038

Regional Homeless Profile                                                    2008

**Table 5**

Percentage of Homeless Persons by Housing Status and City
January 31, 2008

| District | Housing Status | | | | Concentration per 10,000 | | |
|----------|----------------|---|---|---|---------------------------|---|---|
| | Street Homeless % | Emergency Shelters % | Transitional Housing % | Total % | Street Homeless | Sheltered Homeless | Total |
| Carlsbad | 0.6 | 1.7 | 0 | 0.5 | 2.17 | 1.68 | 3.85 |
| Chula Vista | 5.3 | 0.1 | 9.3 | 6.1 | 9 | 11.2 | 20.2 |
| Coronado | 0.8 | 0 | 0 | 0.4 | 13.07 | 0 | 13.07 |
| Del Mar | 0.1 | 0 | 0 | 0 | 4.4 | 0 | 4.4 |
| El Cajon | 5.4 | 6.9 | 3 | 4.8 | 21.49 | 15.63 | 37.12 |
| Encinitas | 13.7 | 0.6 | 0.4 | 7.2 | 83.78 | 2.53 | 86.31 |
| Escondido | 12.1 | 10 | 8.9 | 10.7 | 32.87 | 24.19 | 57.06 |
| Imperial Beach | 1.4 | 0 | 0 | 0.7 | 19.13 | 0 | 19.13 |
| La Mesa | 1.5 | 0 | 0 | 0.8 | 10.13 | 0 | 10.13 |
| Lemon Grove | 0.8 | 0 | 0 | 0.4 | 11.79 | 0 | 11.79 |
| National City | 4.5 | 2.4 | 0 | 2.6 | 28.63 | 3.93 | 32.56 |
| Oceanside | 3 | 6.9 | 5.6 | 4.4 | 6.51 | 12.51 | 19.02 |
| Poway | 0.7 | 0 | 0 | 0.4 | 5.51 | 0 | 5.51 |
| San Diego | 43 | 69 | 63.6 | 53.8 | 12.59 | 18.41 | 31 |
| San Marcos | 0.5 | 0 | 0 | 0.3 | 2.38 | 0 | 2.38 |
| Santee | 1.1 | 0 | 0 | 0.6 | 7.8 | 0 | 7.8 |
| Solana Beach | 0 | 0 | 0 | 0 | 0.75 | 0 | 0.75 |
| Vista | 2.9 | 2.4 | 9.2 | 5.1 | 11.79 | 28.85 | 40.65 |
| Spring Valley | 2.6 | 0 | 0 | 1.3 | | | |
| Total | 100 | 100 | 100 | 100 | 14.73 | 14.24 | 28.97 |
| (N) | (3,856) | (1,009) | (2,717) | (7,582) | | | |

**33**

EXH1-039

Regional Homeless Profile                                                            2008

## Table 6

Percentage of Homeless Persons by Housing Status and City of San Diego Council Districts
January 31, 2008

| District | Housing Status | | | | Concentration per 10,000 | | |
|---|---|---|---|---|---|---|---|
| | Street Population % | Emergency Shelters % | Transitional Housing % | Total % | Street Homeless | Sheltered Homeless | Total |
| District 1 | 4.2 | 0 | 0 | 1.7 | 3.66 | 0 | 3.66 |
| District 2 | 56.2 | 92.1 | 92.1 | 77.5 | 57.85 | 138.55 | 196.41 |
| District 3 | 13.9 | 6.5 | 4.6 | 8.7 | 14.36 | 7.71 | 22.07 |
| District 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District 5 | 1.2 | 0 | 0 | 0.5 | 1.16 | 0 | 1.16 |
| District 6 | 6.2 | 0.7 | 1.7 | 3.3 | 6.37 | 2.12 | 8.49 |
| District 7 | 1.1 | 0 | 0 | 0.4 | 1.21 | 0 | 1.21 |
| District 8 | 17.2 | 0.7 | 1.7 | 7.8 | 17.21 | 2.05 | 19.25 |
| City Total | 100 | 100 | 100 | 100 | | | |
| (N) | (1,658) | (696) | (1,728) | (4,082) | | | |

**34**

Regional Homeless Profile                    **Table 7**                                                2008

Percentage  of Homeless Persons by Characteristics and Housing Status in the San Diego Region
January 31, 2008

| Characteristic | Street Population % | Emergency Shelters % | Transitional Housing % | Total % |
|---|---|---|---|---|
| **Chronic Homeless Status** | | | | |
| Chronic | 0.25 | 45.30 | 14.40 | 23.70 |
| Not chronic | 75.30 | 54.70 | 85.60 | 76.30 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 |
| (N) | -190 | -815 | -2,175 | (7,582*) |
| **Gender** | | | | |
| Male | 79.50 | 63.70 | 51.90 | 67.50 |
| Female | 20.50 | 36.30 | 48.10 | 32.50 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 |
| (N) | -185 | -902 | -1,635 | (7,582*) |
| **Race** | | | | |
| White | 62.90 | 55.50 | 54.70 | 59.00 |
| African American | 16.70 | 23.50 | 18.20 | 18.10 |
| Other | 20.40 | 21.10 | 27.10 | 22.90 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 |
| (N) | -185 | -907 | -1,644 | (7,582*) |
| **Ethnicity** | | | | |
| Hispanic | 19.50 | 19.50 | 35.00 | 25.00 |
| Non-Hispanic | 80.50 | 80.50 | 65.00 | 75.00 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 |
| (N) | -190 | -907 | -1,644 | (7,582*) |
| **Age** | | | | |
| Children/Teens (0-17) | -- | 12.90 | 39.70 | 16.00 |
| Young Adults (18-30) | 4.70 | 12.60 | 17.80 | 10.40 |
| Adults (31-50) | 55.30 | 41.00 | 31.30 | 44.80 |
| Older Adults (51-61) | 20.50 | 26.40 | 8.00 | 16.80 |
| Seniors (62+) | 8.40 | 6.50 | 2.70 | 6.10 |
| Not given | 11.10 | 0.70 | 0.50 | 5.90 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 |
| (N) | -190 | -907 | -1,644 | (7,582*) |
| **Veteran Status (adults only)** | | | | |
| Veteran | 19.50 | 34.80 | 16.30 | 19.90 |
| Non-veteran | 58.40 | 61.10 | 81.90 | 65.80 |
| Not known | 22.10 | 4.10 | 1.80 | 14.30 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 |
| (N) | -190 | -666 | -618 | (6,373*) |
| **Mental Health and Substance Abuse -- Adults Only (categories not mutually exclusive)** | | | | |
| Mental Illness | 24.20 | 23.00 | 23.70 | 23.90 |
| Alcohol Use | 41.10 | 13.90 | 23.20 | 36.90 |
| Street Drug Use | 23.20 | 9.70 | 33.70 | 29.90 |
| **Domestic Violence Victim (excluding street population)** | | | | |
| Yes | -- | 17.10 | 21.40 | 20.20 |
| No/Not known | -- | 82.90 | 78.60 | 79.80 |
| Total | -- | 100.00 | 100.00 | 100.00 |

*Total number of homeless adjusted for sample size

**35**

Regional Homeless Profile                                                    2008

**Table 8**

Unmet Need by Population Characteristics on January 31, 2008
in San Diego County

| Characteristic | 2008 PIT | Total Beds Available | Percent of Unmet Need (2008) |
|---|---|---|---|
| Males -- | | | |
| in non-winter months | 5,116 | 1,877 | 63.3% |
| in winter months | 5,116 | 2,340 | 44.3% |
| Females -- | | | |
| in non-winter months | 2,466 | 1,012 | 59.00% |
| in winter months | 2,466 | 1,172 | 52.5% |
| Substance Use/Drugs | 1,905 | 927 | 51.3% |
| Substance Use/Alcohol | 2,353 | 927 | 60.6.3% |
| Mentally Ill | 1,812 | 192 | 89.46% |
| Domestic Violence (excluding street population) | 753 | 138 | 81.7% |

**36**

EXH1-042



## Appendix II : Point-in-Time Count Methodology for 2008

### DEVELOPMENT

In an effort to more accurately count the street homeless population in San Diego it was necessary to develop a methodology for counting that was supported by research, backed by practical application and that provided assurance of as much accuracy as possible given the limitations and logistics of such a task. Through a partnership between the Regional Task Force on the Homeless, Point Loma Nazarene University's Center for Justice and Reconciliation and San Diego State University's Institute for Public Health, the "Sharing the San Diego Story" project was created through funding provided by the Alliance Healthcare Foundation.

To facilitate the development of a "doable" and "repeatable" methodology for counting, the Research and Data Advisory Roundtable (RADAR) group was convened and included local experts and academic professionals, such as Dr. Dennis Culhane, a nationally recognized expert on homeless enumeration, from the University of Pennsylvania.  The starting point for the RADAR group was an exploration and critique of the traditional methodology for counting, newly recognized "best practices", and the research protocols from other urban areas.  A new methodology was developed and proposed fro use in the San Diego Region. A group of local community stakeholders, including service providers, law enforcement, and researchers reviewed the initial proposal and made recommendations for the development of the final methodology.

### METHODOLOGY - SUMMARY

The San Diego region is divided into small sections that can be covered by enumerators walking and/or driving in that specific area. The areas are printed out as maps which the enumerators use as guides when counting. They look for people who appear to be homeless, based on established criteria, and mark them as well as their specific location on a tally form. The count takes place between the hours of 4 and 8 a.m. throughout the region in an effort to

**37**

reduce duplication. Every effort is made to count as thoroughly as possible; however covering the entire region is unrealistic so a quality control survey is used to help identify areas that may not have been counted. Areas identified as likely to have a high population of unsheltered individuals received the highest priority. During the same time period of the count, a survey of street homeless persons is conducted in order to gather descriptive information about the population.

## METHODOLOGY - DETAIL

1) The count will occur annually, although HUD's requirement is semi-annually, during the week prescribed by HUD.
   a. The count will occur between the hours of 4 a.m. and 8 a.m.
   b. There will be two days set aside: one for the count and one for a planned rain day. The two dates will fall within HUD's requirement.
2) Enumerators will be recruited from each stake holder sector and the general community.
   a. Enumerators will be trained in all aspects of the count prior to the count.
3) The San Diego region was divided geographically into smaller areas represented on maps. Each map was then prioritized as High, Medium, or Low likelihood of finding street homeless persons.
   a. For each map on the High to Medium range, known areas where homeless people often sleep were marked in order to direct enumerators to that specific area.
   b. Enumerators will count each perceived homeless person seen in a given area.
   c. Tents, occupied vehicles, and temporary shelters will be counted individually and no effort is to be made to go inside the tent. A final adjustment factor, x2, will be applied to the number of tents counted. This adjustment is based on a survey of tent dwellers that was conducted in 2006.
4) During the count itself, a group of decoys will be used in order to ensure that every area is counted. If the decoys do not see a group of enumerators in their area, they report a count of homeless persons in the designated area.
5) A quality control element was developed in the form of a short survey, the Congregate Site Quality Control Survey (CSQCS). This element is used to solicit information from

**38**

homeless persons on the day of the count regarding where they spent the previous night and if others were with them. The information from these surveys will be compared to the areas counted by the enumerators and if it was not covered, the number of persons sleeping at that location will be added as an adjustment to the final number.

6)  The Street Characteristics survey is used in an effort to gather detailed data on the street homeless population and provide a fuller, more descriptive picture of them. Demographic data that include HUD key elements such as age, veteran status and longest period of homelessness are collected. The survey will also collect information about the individual's needs and experiences with the service system.

a.  Homeless persons who participate in the survey will be given a gift certificate to a local fast food company or similar business as a gratuity for participating

7)  Use of technology
    a.  All maps, training documents, and surveys are available online for download.
    b.  Maps will be selected by enumerators ahead of training and a record will be kept of which maps are selected and by whom.
    c.  Tally information will be entered on-line via a web-based survey application.

8)  A final report, The Regional Homeless Profile, will be produced and analyzed. Results of the count as well as the characteristics survey will be included and discussed. Additionally, a report on the number of persons who were in shelters the night of the count will be included.

**LIMITATIONS**

In addition to the challenge of counting unsheltered homeless individuals in an area that encompasses more than 4,200 square miles with an estimated population of more than three million people, enumerators face other challenges.

Currently, the Department of Housing and Urban Development (HUD) mandates that each continuum of care (COC) perform a point-in-time (PIT) count during the last seven days of January. This timing may be slightly altered with prior approval from HUD, however it does mean that the count occurs during the winter months. Clearly no one can control the weather nor can weather patterns be predicted well in advance of an event. When

**39**

weather conditions are unfavorable it is predictable that homeless persons will seek out locations that are better protected from the elements and consequently better hidden from the eyes of enumerators. Additionally, enumerators are less likely to enter areas that may be wet or slippery.

While every effort is made to count in all areas, for practical purposes only areas of medium to high likelihood of finding homeless persons are covered. There is also no accounting for the migration of people or changes in cluster patterns. Unpopulated areas become developed, empty buildings become occupied, and community's attitudes towards homeless people change affecting their ability to find safe areas to sleep.

### Recommendations for Improving the Point-In-Time Survey

1. Expand the number enumerators to include both rural areas and urban canyons
2. Clarify definition of rural farm laborers to increase consistency in the count
3. Use data cross validation to overcome limitations of self-reporting
4. Utilize the Regional Data Warehouse (including both ServicePoint and CSTAR™) to compare and validate PIT data (rather than any isolated HMIS).
5. Improve the street characteristics survey
6. Add more sub-populations.

### CONCLUSION

It is vitally important to note that this is a point-in-time count; it is a snapshot of who can be seen and counted on the streets on a given night in the San Diego region. It is not a reflection of the total population that becomes homeless during the course of a year or of the populations that do not wish to be counted.    Point in time is a one-day count and gives the lowest number of homeless people. Thus, this count as well as any and all point prevalence methods, have limited utility for creating or refining homeless programs, identifying gaps in services or for the allocation of resources.  Homeless service providers, government planning bodies and other policymakers are encouraged to study a variety of data sets in order to understand the magnitude and character of homelessness in the San Diego region.

EXH1-046

Regional Homeless Profile

## Appendix III : Community Profiles



# City Of Carlsbad

Known as "the village by the sea," Carlsbad is 35 miles north of downtown San Diego. The city's population is 101,337 in an area that is 39.1 square miles. We counted a total of 22 homeless persons on the street within the city limits and a further 17 were in Emergency/Transitional housing.

☐ City of Carlsbad

▦ Surrounding Jurisdictions

NOTE: These drawings are not to scale
City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data is from the City of Carlsbad website ( www.ci.carlsbad.ca.us ).

**41**

Case 3:09-cv-02699-WVG   Document 1   Filed 12/02/09   PageID.77   Page 77 of 115

Regional Homeless Profile                                                              2008



# City Of Chula Vista

Located seven miles southwest of downtown San Diego, Chula Vista is approximately 50.9 square miles in area with a population of 227,723. We counted a total of 205 homeless persons on the street within the city limits and a further 255 were in Emergency/Transitional housing.

☐ City of Chula Vista

▦ Surrounding Jurisdictions



Chula Vista

NOTE: These drawings are not to scale
City population data is from the California-Department of Finance, January 1, 2006 estimates.  Land area data is from the
City of Chula Vista website (www.chulavistaca.gov).

**42**

Regional Homeless Profile                                              2008



# City Of Coronado

Located on a narrow peninsula of only 14 square miles, at the southwest edge of San Diego Bay, Coronado is commonly referred to as an island.  It is accessible only by two automobile routes - the Coronado Bridge and State Highway 75 from the City of Imperial Beach.  The city's population is 22,957. We counted a total of 30 homeless persons on the street within the city limits. There are no Emergency or Transitional housing facilities in Coronado.

☐ City of Coronado

▦ Surrounding Jurisdictions

NOTE: These drawings are not to scale

Coronado

City population data is from the California-Department of Finance, January 1, 2006 estimates.  Land area data is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**43**

EXH1-049

Regional Homeless Profile                                                                  2008



# City Of Del Mar

Del Mar, with a population of 4,548, is a small coastal community (1.8 square miles) located 18 miles north of downtown San Diego. The City is bounded by the Pacific Ocean and the incorporated jurisdictions of Solana Beach, Encinitas, and San Diego. We counted a total of 2 homeless persons on the street within the city limits. There are no Emergency or Transitional housing facilities in Del Mar.

☐  City of Del Mar

▨  Surrounding Jurisdictions

Del Mar

NOTE: These drawings are not to scale
City population data is from the California-Department of Finance, January 1, 2006 estimates.  Land area data is from the City of Del Mar website ( www.delmar.ca.us ).

**44**

Case 3:09-cv-02699-W-WMC   Document 1   Filed 12/02/09   PageID.80   Page 80 of 115



# City Of El Cajon

El Cajon is located about 14 miles east of downtown San Diego. Encompassing approximately 14.4 square miles, its population is 97,255. Much of the city is residential, however, there are also very large commercial and industrial areas. The City of El Cajon serves as the center for East County commerce as well as legal and cultural activities. There is no agricultural land remaining in the city limits. We counted a total of 209 homeless persons on the street within the city limits and a further 152 were in Emergency/Transitional housing.

☐ City of El Cajon

☐ Surrounding Jurisdictions

El Cajon

NOTE: These drawings are not to scale
City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data and agricultural information is from the San Diego Association of Governments website www.sandag.cog.ca.us.

**45**

EXH1-051

Regional Homeless Profile                                              2008



# City Of Encinitas

A picturesque seaside community located 25 miles north of downtown San Diego, Encinitas has a population of 63,259. The city covers 19.6 square miles including 58 acres of parks and 6 miles of beaches. We counted a total of 530 homeless persons on the street within the city limits and a further 16 were in Emergency/Transitional housing.

☐ City of Encinitas

▦ Surrounding Jurisdictions

NOTE: These drawings are not to scale

Encinitas

City population data is from the California Department of Finance, January 1, 2006 estimates. Land area data is from the City of Encinitas website ( www.ci.encinitas.ca.us ). Agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**46**

EXH1-052

Regional Homeless Profile 2008



# City Of Escondido

Located approximately 25 miles northeast of downtown San Diego, Escondido has a population of 141,788 and encompasses 36.2 square miles. The city has transformed itself from a rural town to an urban community. There is limited agricultural land remaining within the city limits. However, there is a significant amount of agricultural land immediately adjacent to the city limits in the unincorporated areas of the county. We counted a total of 466 homeless persons on the street within the city limits and a further 343 were in Emergency/Transitional housing.

☐ City of Escondido

▨ Surrounding Jurisdictions

NOTE: These drawings are not to scale

Escondido

City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data is from the City of Escondido website ( www.ci.escondido.ca.us ).

**47**

Regional Homeless Profile                                                2008



# City Of Imperial Beach

Imperial Beach is located 10 miles south of downtown San Diego, in the southwestern portion of the County and comprises 4.4 square miles with a population of 27,709. Its coastal setting and warm climate provide an attractive living environment. We counted a total of 53 homeless persons on the street within the city limits. There are no Emergency/Transitional housing facilities in Imperial Beach.

☐ City of Imperial Beach

▨ Surrounding Jurisdictions

NOTE: These drawings are not to scale

Imperial Beach

City population data is from the California-Department of Finance, January 1, 2006 estimates.  Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**48**

EXH1-054



# City Of La Mesa

The City of La Mesa is an inland community located 10 miles northeast of downtown San Diego. It has a population of 56,250 and an area of 9 square miles.  It is made up of a mix of mostly residential and some commercial areas with little-to-no agricultural land. We counted a total of 57 homeless persons on the street within the city limits. There are no Emergency/Transitional housing facilities in La Mesa.

☐  City of La Mesa

▦  Surrounding Jurisdictions



NOTE: These drawings are not to scale
City population data is from the California-Department of Finance, January 1, 2006 estimates.  Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**49**

EXH1-055

Regional Homeless Profile                                                     2008



# City Of Lemon Grove

With a population of 25,451, Lemon Grove is a predominantly residential community with a commercial stretch along the Martin Luther King Jr. Freeway (94).  The city has an area of about 3.9 square miles and is located about 8 miles east of downtown San Diego. The city is bordered by La Mesa on the northern edge, the unincorporated areas on the eastern edge, and National City on the southwestern edge. We counted a total of 30 homeless persons on the street within the city limits.  There are no Emergency/Transitional housing facilities in Lemon Grove.

☐ City of Lemon Grove

☐ Surrounding Jurisdictions

NOTE: These drawings are not to scale

Lemon Grove

City population data is from the California-Department of Finance, January 1, 2006 estimates.  Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**50**

Regional Homeless Profile                                                    2008



# City Of National City

National City is located in the greater San Diego metropolitan area approximately 5 miles southeast of downtown San Diego. The city encompasses an area of approximately 9.2 square miles and has a population of 61,115. We counted a total of 175 homeless persons on the street within the city limits and a further 24 were in Emergency/Transitional housing.

☐ City of National City

▦ Surrounding Jurisdictions

National City

NOTE: These drawings are not to scale

City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**51**

Case 3:09-cv-02699-WVG   Document 1   Filed 12/02/09   PageID.87   Page 87 of 115

Regional Homeless Profile                                          2008



# City Of Oceanside

With a population of 176,644, Oceanside is the third largest city in San Diego County. It lies on the coast, 35 miles north of downtown San Diego, with an area of 42.2 square miles. Camp Pendleton forms the City's northern boundary and has a substantial impact on local employment characteristics and the economic base. We counted a total of 115 homeless persons on the street within the city limits and a further 221 were in Emergency/Transitional housing.

☐  City of Oceanside

▨  Surrounding Jurisdictions

Oceanside

NOTE: These drawings are not to scale
City population data is from the California Department of Finance, January 1, 2006 estimates. Land area data is from the City of Oceanside website ( www.ci.oceanside.ca.us ). Agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**52**

EXH1-058

Case 3:09-cv-02699-WVG   Document 1   Filed 12/02/09   PageID.88   Page 88 of 115

Regional Homeless Profile                                                        2008



# City Of Poway

Poway is located 20 miles northeast of downtown San Diego. It covers approximately 39.1 square miles with a population of 50,830. The city is bordered on the north, west, and south by the City of San Diego, and to the east by foothills and the unincorporated areas of San Diego County. Poway has large areas of Parks and land not in use. However, the city has only a few small agricultural areas left within the city limits. There are numerous agricultural plots just outside the city limits. We counted a total of 28 homeless persons on the street within the city limits. There are no Emergency/Transitional housing facilities in Poway.

☐ City of Poway

▦ Surrounding Jurisdictions

NOTE: These drawings are not to scale

City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data is from the City of Poway website ( www.ci.poway.ca.us ). Agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**53**

EXH1-059

Regional Homeless Profile                                          2008



# City Of San Diego

With a population of 1,316,837, San Diego is the eighth largest city in the nation. The total area of the city limits is 342.5 square miles. The majority of the city land use is for residential, commercial, industrial and parks. There is very little land not in use. The city also has a few small areas of agricultural land remaining within its limits. The majority of this agricultural land is in the northern sections of the city, including Carmel Valley, Rancho Penasquitos, San Dieguito and San Pasqual Valley. There is also a small agricultural area in San Ysidro in the south bay. We counted a total of 1658 homeless persons on the street within the city limits and a further 2424 were in Emergency/Transitional housing.

☐ City of San Diego

▨ Surrounding Jurisdictions

San Diego

NOTE: These drawings are not to scale.
City population data is from the California-Department of Finance, January 1, 2006 estimates.  City of San Diego neighborhood information is from the City website (www.sannet.gov).  Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**54**

EXH1-060

Regional Homeless Profile                                                          2008



# **City Of San Marcos**

Located 30 miles north of downtown San Diego, San Marcos has a population of 79,812. San Marcos is 24 square miles of rolling hills and deep canyons situated approximately 10 miles inland. The city has a large residential area and quite a significant industrial section. There remains a sizable amount of space not currently in use but only a few active agricultural areas. There are large concentrations of agriculture businesses in the county unincorporated areas that border the northern portions of San Marcos. We counted a total of 19 homeless persons on the street within the city limits. There are no Emergency/Transitional housing facilities in San Marcos.

☐   City of San Marcos

▨   Surrounding Jurisdictions

NOTE: These drawings are not to scale.
City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

## 55

Regional Homeless Profile                                                                    2008



# City Of Santee

Santee is a suburban community located approximately 15 miles northeast of downtown San Diego. Santee has approximately 16.5 square miles of area and a population of 55,158. The city is mostly residential with a few commercial and industrial areas. A large portion of Santee is not currently in use, however, most of that area is planned for development. There is no agricultural land remaining within the city limits. We counted a total of 43 homeless persons on the street within the city limits. There are no Emergency/Transitional housing facilities in Santee.

[ ] City of Santee

[ ] Surrounding Jurisdictions

NOTE: These drawings are not to scale.

City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**56**

EXH1−062

Regional Homeless Profile                                                        2008



# City Of Solana Beach

Located about 20 miles north of downtown San Diego, Solana Beach has a population of 13,418 people in a 3.4 square mile area. The city is mostly residential with some large parks and commercial areas. There are also a few small industrial areas. There is no agricultural land remaining in the city limits. There are some small areas of agriculture just outside the city boundaries. We counted a total of 1 homeless persons on the street within the city limits. There are no Emergency/Transitional housing facilities in Solana Beach.

☐ City of Solana Beach

▨ Surrounding Jurisdictions           Solana Beach

NOTE: These drawings are not to scale.

City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data and agricultural information is from the San Diego Association of Governments website (www.sandag.cog.ca.us).

**57**

EXH1-063





# City Of Vista

Vista is an inland city about 35 miles north of downtown San Diego. There are 18.6 square miles of land area in Vista with a population of 94,962. The city is mostly residential with a large industrial area in its southern section and commercial areas spread throughout. There are a few small agricultural areas remaining within the city limits with larger agricultural spaces just outside the city. We counted a total of 112 homeless persons on the street within the city limits and a further 274 were in Emergency/Transitional housing.

☐ City of Vista

▦ Surrounding Jurisdictions

NOTE: These drawings are not to scale.

Vista 

City population data is from the California-Department of Finance, January 1, 2006 estimates. Land area data and agricultural information is from the San Diego Association of Governments website ( www.sandag.cog.ca.us ).

**58**

EXH1-064

Regional Homeless Profile

2008

## Appendix IV : Characteristics Survey

**59**

EXH1-065

Regional Homeless Profile                                                                 2008

| Interviewee ID # | | | | |
|---|---|---|---|---|
| Interviewer Name: | | Today's Date | Time: | AM / PM |

| 1. Interviewee Name: | 2. Place of Birth: | 3. Gender | 4. Veteran: Y / N |
|---|---|---|---|
| | | M–□   F–□ | □ WWII |
| **Ethnicity/Race** | | Transgender–□ | □ Korean War |
| 5a. Which of the following categories best describes | | | □ Vietnam |
| your racial background? (Check all that apply) | | | □ Desert Storm |
| □ Black or African American    □ White | | | □ Current Gulf |
| □ Asian or Pacific Islander    □ Something else ____ | | | Other ____ |
| □ American Indian or Alaskan Native | | | |
| 5b. Are you of Hispanic origin?   [circle] Y / N | | | |

**Living Situation**

| 6a. Where did you sleep last night? | □ Abandoned Building | □ with Friends | □ Motel | □ Building Under Construction |
|---|---|---|---|---|
| | □ Car | □ Garage | □ Relative Home | □ Own House / Apartment |
| | □ Drop-in Center | □ Industry Building | □ Rural Area | □ Public Place (Bus, Library, Bar, etc) |
| | □ Emergency Shelter | □ Jail | □ Storm System | □ Street, Park, or Other Open Space |
| | | | | □ Other: |

| 6b. Surveyor: describe location (use landmarks) |
|---|

| 6c. How long have you stayed in this place? | □ 1day - 7days | □ 8 days- 4weeks | □ 1-6 months | □ 6-12 months   □ 1-2 years   □ >2years |
|---|---|---|---|---|

| 7a. Where do you usually sleep? | □ Abandoned Building | □ with Friends | □ Motel | □ Building Under Construction |
|---|---|---|---|---|
| | □ Car | □ Garage | □ Relative's Home | □ Own House / Apartment |
| | □ Drop-in Center | □ Industry Building | □ Rural Area | □ Public Place (Bus, Library, Bar, etc) |
| | □ Emergency Shelter | □ Jail | □ Storm System | □ Street, Park, or Other Open Space |
| | | | | □ Other: |

| 7b. How long have you stayed in that place? | □ 1day - 7days | □ 8 days- 4weeks | □ 1-6 months | □ 6-12 months   □ 1-2 years   □ >2years |
|---|---|---|---|---|

| 8. Marital Status? | □ Never Married | □ Married | □ Separated | □ Widowed | □ Divorced |
|---|---|---|---|---|---|

| 9a. Does anyone live with you?   [circle]  Yes / No | | |
|---|---|---|
| 9b. If yes, who? | □ Spouse/ Partner    □ Children # ___    □ Friend # ___    □ Other ____ | |
| | 9c. Are children in school? [circle] Y / N | |
| 10. Ages of Dependants Living with you?  d1 ___    d2 ___    d3 ___    d4 ___    □ NA | | |

| 11. Why do you live in this area?    □ Jobs | □ Community | □ Recycling Access | □ School | □ Weather/Comfort |
|---|---|---|---|---|
| | □ Free Food Distributed | □ Friends/Family | □ Safety | □ Service Access | oOther Describe: |

| 12. When did you become homeless or lose your regular housing? That is, when did you stop living in a place of your own or a place where you could stay as long as you wanted? _____ [ a guess is OK] |
|---|

| 13. What is the single longest time period that you were homeless? | □ 1day - 4weeks | □ 6-12 months | □ > 2 years |
|---|---|---|---|
| | □ 1-6 months | □ 1-2 years | □ Other: |

| 14a. How many times have you been homeless in the past 3 years? |
|---|

| 14b. Last Address (Include City)? | 14c. Include zip code: |
|---|---|
| 14d.  Reason for no longer being at that address: | |

| 15. Reason(s) For Being in this Particular Location: |
|---|
| (where you are currently sleeping) |

**60**

Regional Homeless Profile                                          2008

### Health / Employment / Education

| 16. Employment Status: | □ Employed-Full Time | □ Unemployed | □ PT/Day Work | # Current Jobs? ____ | |
|---|---|---|---|---|---|

| 17. What is the highest level of education you have completed? | 8 □ 8th grade / less | 5 □ High school diploma | 2 □ Masters Degree/Phd |
|---|---|---|---|
| | 7 □ Did not complete GED or high school | 4 □ Some college or a 2-year Degree | 1 □ Other |
| | 6 □ Completed GED | 3 □ Finished 4-year Degree | □ Decline to answer |

| 18. Do you receive food stamps or other food vouchers? | □ YES | □ NO | |
|---|---|---|---|

| 19. Do you have a mental or physical disability? | □ Mental | □ Physical | □ No Disability | Nature of Disability? |
|---|---|---|---|---|

| 20. Substance Use? Yes / No : | | □ Alcohol _____ # times/week | □ Street Drug _____ # times/week |
|---|---|---|---|
| Type of drug/alcohol? | | □ Rx Drugs _____ # times/week | □ Other _____ # times/week |

| 21a. Depression? Yes / No | 21b. (If Yes) Recently Depressed?   Yes / No | |
|---|---|---|

| 22. Rate Your Mental Health: | □ Excellent | □ Good | □ Fair | □ Poor |
|---|---|---|---|---|

### Services Used / Desired Services

| 23. What services have you accessed in the the last 6-months? | □ AA / NA | □ Employment | □ Legal Services | □ Drug Treatment / Detox Services |
|---|---|---|---|---|
| | □ Case Management | □ Food | □ Medical Services | □ Emergency Shelter |
| | □ Childcare / Family Serv. | □ Foster Care | □ Psychiatrist | □ Ex-Offender Services |
| | □ Dental Services | □ HIV Services | □ Referrals / Info. | □ Mental Health Counseling |
| | □ DV Services | □ Hospital / E.R | □ Relocation Services | □ Transitional Housing |
| | □ Education | □ Job Training | □ Transportation | Other _____ |

| 24. What have been your sources of income for the last 6-months? | □ Alimony | □ Family/Friends | □ Earned Income (paid work) | □ Veterans Benefits |
|---|---|---|---|---|
| | □ Cal Works | □ General Relief | □ Social Security Benefits (SSA) | □ Workers Comp. |
| | □ Child Support | □ TANF | □ Social Security Disability Income (SSDI) | □ None |
| | □ Education Based | □ Unemployment | □ Supplemental Security Income (SSI) | □ Other. |

| 25. Current monthly income: $_____ | [estimate ok] | |
|---|---|---|

| 26. Other than Housing what services could you benefit from? | □ AA / NA | □ Employment | □ Legal Services | □ Drug Treatment / Detox Services |
|---|---|---|---|---|
| | □ Case Management | □ Food | □ Medical Services | □ Emergency Shelter |
| | □ Childcare / Family Serv. | □ Foster Care | □ Psychiatrist | □ Ex-Offender Services |
| | □ Dental Services | □ HIV Services | □ Referrals / Info. | □ Mental Health Counseling |
| | □ DV Services | □ Hospital / E.R | □ Relocation Services | □ Transitional Housing |
| | □ Education | □ Job Training | □ Transportation | Other _____ |

| 27. Where do you get Healthcare? | □ Hlth. Clinic | □ Hospital ER | □ Shelter | □ Urgent Care | □ Don't Receive HC | □ Other: |
|---|---|---|---|---|---|---|

| 28. Rate your own physical health: | □ Excellent | □ Good | □ Fair | □ Poor |
|---|---|---|---|---|

| 29. Rate your Dental health: | □ Excellent | □ Good | □ Fair | □ Poor |
|---|---|---|---|---|

| 30. What is the one main thing that stands between you and NOT being homeless? | □ Affordable Housing | □ DV Services | □ Hospital / E.R | □ Psychiatrist | □ Transitional Housing |
|---|---|---|---|---|---|
| | □ AA / NA | □ Education | □ Income Sources | □ Referrals / Info. | Other: |
| | □ Case Management | □ Employment | □ Job Training | □ Relocation Services | |
| | □ Childcare / Family Serv. | □ Food | □ Legal Services | □ Transportation | |
| | □ Dental Services | □ Foster Care | □ Medical Services | □ Emergency Shelter | |
| | □ Drug Treatment /Detox Svcs. | □ HIV Services | □ Mental Health Counseling | □ Ex-Offender Services | |

| OPTIONAL: | 31. SS# [or last 4-digits] | 32. Date of Birth:       /    / |
|---|---|---|

| Surveyor Comments: | "NOTE" Upon completion of the survey, if the person has identified him/herself as homeless ask if he/she would like a homeless resource guide &/or to be taken to a shelter for this evening. |
|---|---|

**61**

EXH1-067

## Appendix V : Homeless Enumeration Tally Form

Enumerator #1: ______________________ Enumerator #2: ____________________

Phone: ______________________________ Enumerator #3 : ___________________

City: Santee 3.tif

| **INDIVIDUALS**<br>*Tally Marks :* | **Farm Workers/ Day Laborers**<br>*Tally Marks :* | **TENTS (only)**<br>**Count Each Tent as ONE**<br>*Tally Marks :* |
|---|---|---|
| **TOTAL** | **TOTAL** | **TOTAL** |

Please write any comments or observations on the back of this form.

**MARK locations counted on the map**

1 | SAN DIEGO VOLUNTEER LAWYER PROGRAM
625 Broadway, Suite 925
2 | San Diego, California 92101
Telephone: (619) 235-5656
3 |
(Additional Plaintiffs' Counsel on signature page)
4 |
MICHAEL J. AGUIRRE, CITY ATTORNEY
5 | Office of the City Attorney
1200 Third Avenue, Suite 1100
6 | San Diego, California 92101-4100
Telephone: (619) 533-5800
7 |
Attorney for Defendant CITY OF SAN DIEGO and SAN DIEGO POLICE DEPARTMENT
8 |
9 |
10 | **UNITED STATES DISTRICT COURT**
11 | **SOUTHERN DISTRICT OF CALIFORNIA**

12 | GREG SPENCER; RANDALL FRENCH; ) Case No. 04CV-2314BEN (WMC)
MARGARET ARMSTRONG; JIMMY )
13 | WARD; JEFFREY MILES; SYLVIA )
LEVANOS; JUAN ALEJO; STEVEN GREER; ) Assigned to Hon. Roger T. Benitez/
14 | and ROBERT YBARRA, individually and on ) Magistrate Judge William McCurine
behalf of themselves and all others similarly )
15 | situated, )
) **SETTLEMENT AGREEMENT AND**
16 | Plaintiffs, ) **STIPULATION TO CONTINUING**
) **JURISDICTION - 28 U.S.C. 636(c)**
17 | v. )
)
18 | THE CITY OF SAN DIEGO; THE CITY OF )
SAN DIEGO POLICE DEPARTMENT, and )
19 | SAN DIEGO POLICE CHIEF WILLIAM )
LANSDOWNE, in his official capacity only, )
20 | )
21 | Defendants. )
)
22 |

23 | IT IS HEREBY STIPULATED AND AGREED by and between GREG SPENCER and
24 | the Class representatives, individually and on behalf of all others similarly situated on the one
25 | hand, and Defendants including the CITY OF SAN DIEGO; CITY OF SAN DIEGO POLICE
26 | DEPARTMENT; and SAN DIEGO POLICE CHIEF WILLIAM LANSDOWNE, in his
27 | ///
28 | ///

EXH2-001

1
SETTLEMENT AGREEMENT AND STIPULATION TO CONTINUING JURISDICTION

1  official capacity only recognizing that this Settlement Agreement and Stipulation for Continuing

2  Jurisdiction is subject to San Diego City Council approval:

3  **DEFINITIONS**

4  **A.  Settlement Agreement and Stipulation to Continuing Jurisdiction:** Refers to

5  this document entered into under the auspices of Magistrate Judge William McCurine on

6  February 21, 2007 resolving the claims of the parties on an interim basis and subjecting the terms

7  of the resolution to the continuing jurisdiction of Magistrate McCurine.

8  **B.  Class Members:** The Class refers to homeless persons as defined in the Second

9  Amended Complaint including individuals as defined in the Stewart B. McKinney Homeless

10  Assistance Act, 42 U.S.C. Section 11301, et seq., as persons who lack a fixed, regular, and

11  adequate nighttime residence in the City of San Diego.

12  **C.  Class Action Complaint ("Complaint")** Refers to the Second Amended Class

13  Action Complaint for Declaratory Relief, Injunctive Relief and Damages under the United States

14  Civil Rights Act (42 U.S.C. section 1983 and California Code of Civil Procedure section 1060)

15  as filed in the United States District Court for the Southern District of California as Civil Case

16  No. 04CV-2314BEN(WMC).

17  **D.  Answer:** Refers to the Defendant CITY OF SAN DIEGO'S Answer to Plaintiffs'

18  Complaint as filed on or about May 19, 2006.

19  **E.  Preliminary Injunction:** Refers to Plaintiffs' Motion for a Preliminary

20  Injunction Prohibiting Defendants from Issuing Citations for Violation of Penal Code Sections

21  647(j) at night, as filed pursuant to Federal Rules of Civil Procedure 65, originally set for hearing

22  January 29, 2007 and presently off calendar.

23  **F.  Defendants:** Refers to CITY OF SAN DIEGO, the SAN DIEGO POLICE

24  DEPARTMENT, and CHIEF OF POLICE WILLIAM LANSDOWNE in his official capacity

25  only.

26  ///

27  ///

28  ///

EXH2-002

2
SETTLEMENT AGREEMENT AND STIPULATION TO CONTINUING JURISDICTION

# I.

## SETTLEMENT AGREEMENT

This Agreement represents a compromise and settlement of disputed claims. Nothing in this Agreement is intended to or will be construed as an admission by Defendants that the Plaintiffs' claims in the lawsuit have merit nor that it has any liability to Plaintiffs or the Class on those claims nor an admission by Plaintiffs that Defendants' defenses in the action have merit.

This Agreement is made for the sole purpose of consummating a settlement that allows the continuing jurisdiction of Magistrate Judge William McCurine, United States District Court, Southern District of California, in this matter to monitor certain altered policies and practices of the SAN DIEGO POLICE DEPARTMENT and the CITY OF SAN DIEGO with periodic review, if necessary, by the Court. By entering into this Agreement, none of the parties admit the allegations or contentions of any other party. Each party is entering into this Agreement for the sole purpose of resolving this matter and avoiding the time and expense incident to protracted litigation before this Court.

Plaintiff Class now desires to take its previously scheduled Request for Preliminary Injunction off calendar and to compromise the claims as set forth in the Second Amended Complaint in consideration of the Defendants' agreement to alter certain policies and practices and take certain remedial action, including but not limited to the adoption of policies by the SAN DIEGO POLICE DEPARTMENT to modify enforcement actions regarding Penal Code section 647(j) generally, and suspending citations for Penal Code section 647(j) between 9:00 p.m. and 5:30 a.m., as set forth in Exhibit A, attached hereto.

Attorneys for the Plaintiff Class waive attorneys' fees and costs in this matter. Defendants agree to bear their own fees and costs.

# II.

## FAIRNESS OF SETTLEMENT

The Parties stipulate and agree that the settlement set forth in this Agreement, and its terms, are fair, just, reasonable, adequate and equitable to the Class Members and Defendants,

1 | are the product of good faith, arms-length negotiations between the Parties, and are consistent
2 | with public policy, and fully comply with applicable provisions of law.

**III.**

**CLASS CERTIFICATION**

5 |      A.     Although the matter is styled as a Class Action, the parties, Plaintiff and
6 | Defendant, recognize that in consideration of the Defendant modifying its procedures and
7 | otherwise taking formal action to abate and modify its actions with regard to the Class, that Class
8 | certification would remain unnecessary.  For purposes of this Class Action, the parties are
9 | treating it as Federal Rule of Civil Procedure Rule 23(2) action inasmuch as the CITY is
10 | opposing the Class or has acted or refused to act on grounds generally applicable to the Class,
11 | vacating appropriate final injunctive relief with respect to the Class as a whole. Because of this
12 | provision, no notice to the Class is required.

13 |      B.     The parties agree that the lawsuit shall in all other respects be stayed pending
14 | formal approval of the requisite CITY authorities, including but not limited to the CITY Council,
15 | Mayor, and Chief of Police, after which the settlement will fall under the jurisdiction of
16 | Magistrate McCurine.

**IV.**

**INJUNCTIVE RELIEF**

19 |      The parties agree that the SAN DIEGO POLICE DEPARTMENT Training Bulletin
20 | dated November 17, 2006 will form the nucleus of the modification of the Defendants' Penal
21 | Code section 647(j) practices.  The parties specifically agree that provisions of "Illegal Lodging
22 | Enforcement Guidelines (2)" shall be modified to read, "Officers will not ordinarily issue Penal
23 | Code section 647(j) citations between the hours of 2100 and 0530."

24 |      The terms and provisions of the Training Bulletin, a document of three pages, are
25 | attached hereto and incorporated by reference as Exhibits A1 through A3 and made a part of the
26 | settlement as though fully set forth herein.

27 | ///
28 | ///

EXH2-004

4

SETTLEMENT AGREEMENT AND STIPULATION TO CONTINUING JURISDICTION

## V.

## CONTINUING JURISDICTION OF THE DISTRICT COURT

The parties agree and stipulate to continuing jurisdiction of the District Court and specifically consent to the continued jurisdiction under 28 U.S.C. section 636(c) to the binding jurisdictional authority of Magistrate Judge William McCurine, who shall have full and complete authority to interpret the terms of enforcement of the Stipulation, the adherence or lack thereof to the terms of the Settlement Agreement and Stipulation, to alter, amend, and/or terminate the Settlement Agreement and Stipulation upon application and notice to either party.  The parties specifically waive their right to appeal any such Order enforcing or interpreting the decree as a portion of the Stipulation to Continue Jurisdiction.

## VI.

## MUTUAL FULL COOPERATION

The parties agree to fully cooperate with each other to accomplish the terms of this Agreement including but not limited to execution of such documents, or to take other such action as may reasonably be necessary to implement the terms of this Agreement.

The parties to this Agreement shall use their best efforts, including all efforts contemplated by this Agreement, and any and all other efforts that may become necessary by order of the Court, or otherwise to effectuate this Agreement, and the terms set forth herein.  In the event the parties are unable to reach agreement on the form and content of any document needed to implement the Settlement Agreement, and any supplemental provisions that may become necessary to effectuate the terms of the Settlement, the parties agree to seek the assistance of the Court, Magistrate William McCurine under the Stipulation to Continue Jurisdiction under 28 U.S.C. section 636(c).

## VII.

## AGREEMENT NOT ADMISSIBLE

This Agreement between the parties is a settlement document and shall, pursuant to requisite Federal and California Evidence Codes, be inadmissible in evidence in any proceeding,

SETTLEMENT AGREEMENT AND STIPULATION TO CONTINUING JURISDICTION

EXH2-005

1   except an action or proceeding to interpret, enforce, or otherwise seek relief under the Agreement

2   pursuant to this Stipulation of Continuing Jurisdiction.

3                                 **VIII.**

4                     <u>**GENERAL PROVISIONS**</u>

5       **A.**     **Entire Agreement.**

6         This Agreement and Stipulation to Continuing Jurisdiction constitute the entire

7   Agreement between the parties and is the result of a mediation session on February 21, 2007

8   under the auspices of Magistrate Judge William McCurine.  The transcript of the proceedings

9   before Judge McCurine is incorporated herein as though fully set forth in the event of a

10   disagreement as to the terms or conflict between the terms of the documentation and the

11   proceedings before Judge McCurine who shall retain full jurisdiction to make these

12   interpretations.

13         This Agreement and Stipulation to Continuing Jurisdiction resolves any and all claims,

14   known or unknown, that were or could have been asserted in the second amended complaint or

15   that relate to the enforcement of Penal Code §647(j), prior to the execution of this Agreement as

16   long as the terms of the settlement remain in full force and effect.

17       **B.**     **Authorization to Act.**

18         Class counsel warrants and represents that it is authorized by Plaintiffs, and counsel of

19   record for Defendants warrants that it is authorized by Defendants, to take all appropriate action

20   required to effectuate the terms of this Agreement.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

EXH2-006

SETTLEMENT AGREEMENT AND STIPULATION TO CONTINUING JURISDICTION

1  C.      **Entity Signatories.**

2        Any individual executing this Agreement, or any related document, on behalf of a

3  corporation, entity or organization who, as shown by the signature blocks below, is to execute

4  this Agreement, hereby warrants and promises for the benefit of all parties hereto that he or she

5  has been duly authorized by such corporation, entity or organization to execute this Agreement.

6

7  **IT IS SO AGREED:**                           **SAN DIEGO CITY ATTORNEY**

8

9  Dated: _____, 2007              _____

10                                                    By: Michael J. Aguirre

11
   Dated: _____, 2007              _____
12

13

14  **IT IS SO STIPULATED:**                     **SAN DIEGO VOLUNTEER**
                                                  **LAWYERS PROGRAM**
15                                                Attorneys for Plaintiff and the Class

16
   Dated: _____, 2007              **COHELAN & KHOURY**
17                                                605 C Street, Suite 200
                                                  San Diego, CA 92101-5307
18                                                Telephone:    (619) 595-3001

19

20                                                _____
                                                  By:    Timothy D. Cohelan, SBN 60827
21

22  Dated: _____, 2007              **DREHER LAW FIRM**
                                                  835 Fifth Avenue, Suite 202
23                                                San Diego, California 92101
                                                  Telephone:    (619) 230-8828
24

25                                                _____
                                                  By:    Robert S. Dreher, SBN 120527
26

27

28                                                                        EXH2-007

San Diego Police Department

<u>TRAINING BULLETIN</u>

A PUBLICATION OF THE SAN DIEGO POLICE DEPARTMENT

WILLIAM M. LANSDOWNE
CHIEF OF POLICE

06-03                                                        November 17, 2006

<u>ILLEGAL LODGING - Penal Code 647(j)</u>

I.     BACKGROUND

Penal Code 647(j) prohibits lodging in any building, structure, vehicle, or place, PUBLIC or PRIVATE, without the permission of the owner or lawful possessor (i.e. tenant, manager). The San Diego Police Department's enforcement of 647(j) P.C. is citizen complaint driven.

Often those in violation of illegal lodging (PC 647(j)) are individuals who also suffer from a wide range of health problems, including contagious diseases, mental illness, and narcotic addiction. They may also be involved in other criminal behaviors, including disorderly conduct offenses, such as public urination, and more serious crimes including drug dealing. These behaviors affect both the illegal lodger and the citizens who work and live in the area.

The police response to areas affected by illegal lodgers is threefold (presented in no significant sequence):

- To prevent crime;
- To enforce the law; and,
- To assist those who cannot assist themselves.

During enforcement action for illegal lodging officers must remember that part of the "police role" is to provide education on the whereabouts of social agencies and inform individuals that they are breaking the law. Individuals thought to be in violation of PC 647(j) should be educated about illegallodging laws and given handouts, such as the "Downtown Directory of Social Services" and "Homeless Outreach Team" business cards. Documentation of these contacts should be made on field interview forms.

In addition to enforcing the law, police also assist those who cannot assist themselves by putting them in contact with appropriate medical, social, psychiatric, and other services. This assistance can range from providing referral information on working with other professionals such as PERT, the Homeless Outreach Team or any San Diego County services. Additionally, the police have a responsibility to physically take a person into

Page 1of3

custody when they display an imminent threat either to themselves or others pursuant to
W&I5150.

II.    ILLEGAL LODGING ENFORCEMENT GUIDELINES

The following guidelines are to be followed with respect to illegal lodging enforcement:

1.    Officers should only enforce illegal lodging in those areas where the City has
received complaints.

2.    Officers will not ordinarily issue Penal Code section 647(j) citations between the
hours of 2100 and 0530.

3.    If an officer encounters an individual illegally lodging in an area where complaints have
been received, prior to taking any enforcement action, the officer should first conduct
computer checks for past illegal lodging history, warrants, criminal history, ARJIS for
field interviews related to past illegal lodging warnings, and :verification of status of any
citizen complaints. Officers should inquire as to whether the individual sought shelter
for the night before, and document what that individual did or did not do with respect to
seeking shelter the night before the potential enforcement action.

4.    Officers should then determine whether the individuals in violation of PC 6470) desire
assistance in the form of shelter or other social services. If services are requested,
officers should direct or assist interested individuals to the appropriate service
providers. Officers should educate individuals of applicable illegal lodging laws,
explain how to obtain shelter beds and give "Homeless Outreach Team" contact
information to the individual. If the individual refuses services, officers shall ask the
individual to voluntarily move from the area.

5.    If an individual refuses to voluntarily move from the area in question and rejects all
offers for shelter and social services, officers may then consider citing for illegal
lodging (PC 647(j)) as described in the procedure below.

6.    Officers should consider physical arrest for PC 647(j) only in those situations where an
individual has either been repeatedly cited within a short period of time (30 days) or
where an individual refuses to leave the area in question after being cited by an officer.

III.   ILLEGAL LODGING ENFORCEMENT PROCEDURES

Prior to any arrest or citation th.e following **procedures** should be followed:

Illegal lodging arrests and citations must document the two ELEMENTS of "lodging and
without permission":

1.    Lodging

Page 2 of 3

EXH2-009



a.   What kind of place/structure is it? Address is not enough information. Note if regular encampment; type and frequency of citizen complaints.
b.   Bedding; blanket, tarp, box, sleeping bag, etc.
c.   Belongings-food, pets, clothing, shopping cart, utensils, and furniture?
d.   Prior Contacts-for what, when, where?
e.   Admissions-how long there, how often there, overnight?
f.   It is insufficient to support a charge of illegal lodging if a person is sleeping with no other evidence of lodging.

2.   Without Permission
a.   Statement by owner/occupant
b.   Owner/occupant's name and address.
c.   Trespass letter/Letter of Authorization will be sufficient.

IV.   ADDITIONAL INVESTIGATIVE CONSIDERATIONS

1.   Photographs of suspect at encampment, with his/her belongings are very helpful.

2.   Completely fill out form reports and individualize contact with a narrative. Attempt to locate the reporting party and/or any witnesses to the illegal lodging. Witness and reporting party statements/information must be included in the reports.

   Officers should ask investigative type questions while speaking with suspects. For example:
   •   How long have you been homeless?
   •   Have you had any contacts with social services agencies?
   •   Which ones and what happened?
   •   Are you currently receiving any type of income? (I.e. Social Security)
   •   Have you been warned about illegal lodging?
   •   Have you had contact with the SDPD Homeless Outreach Team?
   •   Have you attempted to locate housing or shelter?

3.   Investigate for evidence of other crimes such as under the influence, warrants, and possession of paraphernalia or controlled substances.

Any questions or concerns regarding this Training Bulletin should be directed to Sergeant Rick Schnell, Homeless Outreach Team, 619-850-0655 or Teresa Clanton, Legal Assistant, City Attorney Neighborhood Prosecution Unit, 619-533-5658.

Page 3 of 3

EXH2-010

**EXHIBIT 3**

// WEDNESDAY, DECEMBER 9TH



SHARE

Search

Follow San Diego CityBeat

# One person's trash

**Homeless citizens argue that police, city destroy their stuff**

By Kelly Davis

Login    Register    RSS    Contacts Join Redd City Be Find a Paper

FREE DINNER

CLICK FOR DETAILS

877.PEARLSD  TOLL FREE    1410 ROSECRANS STREET

Home    News    Opinion    Blogs    Music    Arts    Events    Eats    Special Issues    Multimedia    Classified    Promotions    Archive



*A list of items people say were thrown away by city workers. Photo by Kelly Davis*

Katherine Peace was walking down East Village's 16th Street on Tuesday, Sept. 22, at around 11 a.m. when she saw police cars and a white city trash truck pull up near a fence-enclosed empty lot. A group of homeless people who normally camp on the sidewalk had left their stuff behind—shopping carts, bedrolls, backpacks and the like—amid other trash and debris that had accumulated in the area. Some people were across the street eating breakfast at God's Extended Hand, the homeless-services mission; others had walked around the corner to the Neil Good Day Center.

"They park their shopping carts there all the time," Peace said. "Nobody messes with them."

Michael Kilpatrick, a volunteer at God's Extended Hand, also saw the vehicles pull up. City workers then started throwing the grocery carts and everything they contained into the truck, Kilpatrick said, where the items were then compacted. When Kilpatrick saw city workers reach for two carts belonging to a man he knew, he told a police officer that the carts' owner was over at the day center. Kilpatrick was told he had two minutes to get him.

"I told [the carts' owner], 'Hey they're about the crush your stuff,'" Kilpatrick said. "He came down and then they were, like, 'It's too late,' and they crushed everything he had. They let him take the backpack because it had his personal information, and then they just took all the stuff out of his carts—like his blankets and everything he owned—and they just put everything in the trash compactor, all his personal belongings. They were, like, 'Sorry, it's too late. We posted a warning.'"

Yolanda Dillard's stuff was in a "Born Again Basket"—a donated, fixed-up, pale-blue-painted grocery cart given to her by the nonprofit Isaiah Project.

"Everything I had, birth certificate and everything," was in the cart, Dillard said. "Nothing's left."

## CALENDAR  DINING  MUSIC  MOVIES  CLUBS

| Mon 30 | Tue 1 | Wed 2 | Thu 3 | Fri 4 | Sat 5 | Sun 6 |
|---|---|---|---|---|---|---|

MONTHLY VIEW>>

**The best things to do in San Diego**
Monday November 30

**WOODY TASCH**

Join the author for an installment of the "Book and a Beer with..." series, and learn more about his book, *Inquiries into the Nature of Slow Money*.

MORE>>

7 other things to do in San Diego Monday



## North Park's Last Dive Bar

**Last Blog On Earth**
**San Diego Shows–Sunday, November 29**
11/29/2009 — Seth Combs
**San Diego Shows–Saturday, November 28**
11/28/2009 — Seth Combs
**Medipot task force recommendations**
11/27/2009 – Dave Maass

EXH3-001

Jose Ysea, spokesperson for the city's Environmental Services Department, said the cleanup was a joint operation with the San Diego Police Department that stemmed from a citizen complaint about homeless people camping at three East Village sites. Ysea said his department handled 27 similar abatements between July 1, 2008, and June 30, 2009, none of which generated any complaints.

"This is the first one that actually drew media attention," he said.

Ysea said warning signs were posted along the 400 block of 16th Street, as well as two other nearby locations that were cleared on the same day. Kilpatrick said he never saw any signs. But at least one was still up last Tuesday, a copy of which was faxed to CityBeat by an attorney who plans to file a claim against the city on behalf of people who had their possessions destroyed. The sign shows a date posted of Sept. 17 and says that the area would be "abated of all waste (rubbish, recyclable waste material, etc.) on or after 9-18-09." It also says that "items of personal value must be removed prior to the above date or they will be removed by City forces."

Under city municipal code, it's illegal for personal possessions to obstruct the public right-of-way. According to code, unattended items "whose owner cannot be readily identified are presumed to be abandoned." But the law also states: "Wherever possible, Enforcement Officials shall make a reasonable effort to ascertain whether the unattended personal property or possessions have been abandoned," and "unattended personal property or possessions that are sanitary and saleable or useable and of a value greater than one hundred dollars ($100) shall be transferred as soon as is practicable to the Chief of Police."

Ysea said it's up to city workers to determine what's salvageable before throwing it out.

"They'll do a quick visual assessment," Ysea said. "They won't go through every basket or every bag that's there, but they'll be looking for items of value, for personal items such as prescription drugs. If they have their names on it and it looks like something that's going to need to be picked up later, they'll impound it through the Police Department."

Peace said she didn't see anything being set aside or inventoried—everything went into the truck and was compressed, she said.

"No one told them they could pick up their stuff," Peace said. "One lady just got her insulin. It hadn't been compacted yet, but they told her it was too late."

Luis Quinones said he lost everything, including his mother's engagement and wedding rings.

"We told them, 'We're right here.' They told us, 'You're too late,'" Quinones said. When asked by a reporter why he left valuable items unattended, Quinones said he was at God's Extended Hand eating breakfast and the rules forbid people from bringing carts inside. He'd gotten into the habit of leaving his cart across the street with everyone else's.

"I figured it's going to be safe," he said.

Assistant Police Chief Boyd Long said that no items were turned over to the Police Department. He said he was told that code officers from Environmental Services took photographs of the site prior to the cleanup and also photographed items before putting them into the truck.

Scott Dreher, an attorney who represented the homeless in a challenge to the city's illegal-lodging law, said he plans to file a claim against the city this week on behalf of people who had their property destroyed. Dreher pointed to a July 2008 class-action lawsuit in which the city of Fresno was required to pay $2.25 million after a federal judge found that city employees repeatedly and improperly seized and destroyed homeless folks' personal property.

Dreher refers to what happened last week as a "raid."

"The city took the carts, which they knew were not trash and belonged to people," he said.

Long said that last Tuesday, after he received a call from CityBeat asking about the cleanup, he immediately drove over to God's Extended Hand. He talked to Kilpatrick and other witnesses and left his business card with instructions that anyone who had asked for their property back and were refused should call him.

"I never got a call back," Long said, adding that he's confident his officers behaved properly.

"If someone said, 'That's my property' and we continued to let it be put on the truck, I've got a real problem with that," he said.

*Write to kellyd@sdcitybeat.com and editor@sdcitybeat.com.*

*Would you like your online comment to be considered for publication in our print edition? Include your true full name and neighborhood of residence.*

- Published: 09/29/2009
- Other Stories by Kelly Davis

SHARE

San Diego Shows–Friday November 27
11/27/2009 — Seth Combs

An interview with The Transit War's Brad Bohensky
11/26/2009 — Sammi Skolmoski

**Political Lunacy**
**Give Thanks**
11/26/2009 — Carl Luna


HONG KONG
GENTLEMEN'S CLUB
TIJUANA, MEXICO
100's of Women
Minutes from the Border
No Cover!
If you can dream it, it can happen.
Free Border Pick Up
See the Girls »




THE DIFFERENCE IS
DRINKABILITY


San Diego New Year's Eve

Date Posted: 5-17-05

Posted by: EL L312



THE CITY OF SAN DIEGO

Waste Reduction & Disposal Division  •  Environmental Services Department
9601 Ridgehaven Court, Suite 320  •  San Diego, California  92123-1636

# Special Notice

## In compliance with Municipal Code(s) 54.0105, 54.0208 and 54.0212

This City-owned property will be abated of all waste (rubbish, recyclable waste material, etc.) on or after: 5-18-05

All items of personal value must be removed prior to the above date or they will be removed by City forces.

Waste Reduction & Disposal Division
(858) 694-7000

*This information is available in alternative formats upon request.*

♻ Printed on recycled paper

(6-07)

EXH4-001

℀JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

The Isaiah Project, Inc., John A. Crawford, Robert Barajas, Marvin Cooper, Yolanda Diaz, Irene Martinez-Cruz, et al.

### DEFENDANTS

City of San Diego, City of San Diego Police Department, City of San Diego Police Chief William Lansdowne, et al.

**(b)** County of Residence of First Listed Plaintiff    San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Robert Scott Dreher, SBN 120527 Dreher Law Firm, 835 Fifth Avenue, Suite 202, San Diego, CA 92101, (619) 230-8828

Attorneys (If Known)

'09 CV 2699 BTM    WVG

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
U.S.C. Section 1983
Brief description of cause:
Civil rights action brought under U.S. Constitution and U.S.C. Section 1983 and other statutes.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)    JUDGE                    DOCKET NUMBER

DATE 12/02/2009        SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 7864    AMOUNT 350.00    APPLYING IFP        JUDGE        MAG. JUDGE

MS    12/02/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS007864
Cashier ID: msweaney
Transaction Date: 12/02/2009
Payer Name: DREHER LAW FIRM
-----------------------------------
CIVIL FILING FEE
 For: ISAIAH PROJECT V CITY OF SD
 Case/Party: D-CAS-3-09-CV-002699-001
 Amount:        $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 2951
 Amt Tendered:  $350.00
-----------------------------------
Total Due:       $350.00
Total Tendered: $350.00
Change Amt:      $0.00


There will be a fee of $45.00
charged for any returned check.
```